STAMATAKIS INDUSTRIES, INC., *et al.*, Plaintiffs-Appellants, v. FREDERICK KING *et al.*, Defendants-Appellees.

First District (4th Division)   No. 87—0650

Opinion filed December 31, 1987.

John C. Stiefel, Sidney L. Rosenfeld, and Warren Lupel, all of Solomon, Rosenfeld, Elliott & Stiefel, Ltd., David C. Roston, Gary L. Specks, and Jeffrey P. DeJong, all of Altheimer & Gray, and Kenneth F. Levin, of Law Offices of Kenneth F. Levin, Chartered, all of Chicago, for appellants.

Ronald Butler, Ellen Claire Newcomer, and Anthony E. Rothschild, all of Butler, Rubin, Newcomer, Saltarelli & Boyd, and Thomas F. Ging and Michael Benz, both of Isham, Lincoln & Beale, both of Chicago, for appellees.

JUSTICE JIGANTI delivered the opinion of the court:

One of the plaintiffs, Stamatakis Industries, Inc., purchased all of the shares of stock of another one of the plaintiffs, Premier Engraving Company, Inc. The stock was purchased from Frederick King and other defendants who were all shareholders of Premier. The complaint charged all the defendants with fraud and breach of contract. The trial court entered summary judgment in favor of the defendants Frederick King and King Graphics, Inc. The other defendants are not part of this appeal.

Frederick King was the president, chief executive officer, chairman of the board, and a 19% shareholder of Premier. He negotiated the sale of all the shares of Premier to Stamatakis. The purchase price was $1,250,000 with $450,000 cash paid at the closing and

$400,000 payments due one year and two years after the closing. The complaint alleges that King, as agent of Premier, engaged in extensive negotiations with Stamatakis. The complaint further alleges that King and other Premier shareholders repeatedly and accurately represented to Stamatakis that King absolutely controlled the single largest Premier customer, which accounted for the predominant portion of Premier's revenue, and that King further controlled several other significant smaller customers. According to the complaint, it was fully understood that an absolute condition of the agreement was that King enter into an employment contract to remain in the employ of Stamatakis for five years and to maintain and service the King-controlled business. A further condition was that for a period of two years after termination of King's employment, King would strictly refrain from directly or indirectly competing with Stamatakis. Either party had a right to terminate the employment agreement at any time on 90 days' prior written notice.

The tort count sought damages for promissory fraud. The complaint alleged that while King was chief executive officer, president and chairman of the board of Premier, he engaged Premier in a major campaign to acquire capital, equipment and machinery unique to the Chicago graphics services industry. It also alleged that King fully intended to have Premier acquire this equipment even though Premier could not afford it and that after the sale to Stamatakis, King intended to have Premier complete the purchase. The more specific factual allegation of fraud is that the completion of this purchase was an undisclosed condition of King's remaining at Premier and not competing with Stamatakis after his employment terminated, and since King never intended unconditionally to perform his promise, this was a misrepresentation constituting fraud. Sometime after the closing of the sale of Premier to Stamatakis, Alex Stamatakis told King that he did not want Premier to purchase the equipment. King terminated his employment nine months later.

■■ ■ To state an action for fraud the complaint must allege that there was a false representation of material fact, the party making the statement must have known or believed the statement to be untrue, the party to whom the statement was made had a right to rely on it and in fact did so, the statement must have been made for the purpose of inducing the other party to act, and finally, that the reliance by the person to whom the statement was made led to his injury. (*Smith v. Jones* (1986), 113 Ill. 2d 126, 497 N.E.2d 738.) Illinois does not allow a recovery for promissory fraud, that is, fraud based on a false representation of intention of future conduct. (*Steinberg v. Chi-*

*cago Medical School* (1977), 69 Ill. 2d 320, 371 N.E.2d 634; *Roda v. Berko* (1948), 401 Ill. 335, 340, 81 N.E.2d 912, 915; *Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 408 N.E.2d 782.) The promissory fraud alleged here is a promise to perform a contract with an intention not to perform. Illinois courts have held that this is not actionable. (*Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 408 N.E.2d 782.) However, Illinois does recognize an exception to the nonliability for promissory fraud rule if the promise is part of a scheme employed to accomplish the fraud. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 334, 371 N.E.2d 634, 641; *Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 1112, 408 N.E.2d 782, 787.) King does not specifically argue that there was no fraud, but does argue that the allegations here do not represent a scheme employed to accomplish a fraud. King argues that at worst he is charged with a mental reservation and not a specific scheme to defraud.

Case law gives little guidance as to what the distinguishing features of a scheme are. *Roda v. Berko* firmly established in the law the scheme exception to the rule of nonliability for promissory fraud. However, in *Roda* the scheme was only a fraudulent promise that the property of the defrauded party would be used in a particular way.

In *Vance Pearson, Inc. v. Alexander*, the court faced the problem of distinguishing promissory fraud from the scheme exception. It stated:

> "Distinguishing between the general rule in Illinois that a promise of future conduct made without intention to perform is not misrepresentation and the exception to the rule which makes such a promise a misrepresentation if it is the scheme to accomplish a fraud is not easy. As fraud occurs when a misrepresentation is made with intent to induce a victim to rely thereon and a victim is deceived and relies thereon to his detriment, such misrepresentations are ordinarily the schemes by which the victim is defrauded regardless of whether the misrepresentation is as to the declarant's future intent or otherwise. Thus it would seem that the exception tends to engulf and devour much of the general rule and lessen any disparity between the Illinois rule and the majority rule as explained by Prosser."
> *Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 1112, 408 N.E.2d 782, 787.

Professor Michael J. Polelle in his article entitled "An Illinois Choice: Fossil Law Or An Action For Promissory Fraud?" traces the history of the rule against promissory fraud, urges its rejection by the

Illinois Supreme Court and comments that the lack of rationale for the exception leads to a discretionary application of the exception. (Polelle, *An Illinois Choice: Fossil Law Or An Action For Promissory Fraud?*, 32 De Paul L. Rev. 565, 567, 581 (1983).) Illinois is one of the distinct minority of States that does not allow actions for promissory fraud. (32 De Paul L. Rev. at 569-70.) It is at odds with the Restatement (Second) of Torts, section 525, which provides:

> "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." Restatement (Second) of Torts §525, at 55 (1977).

The factual setting in *Pearson* which discussed the scheme exception was that the defendant agreed to install a scale by a certain date. The evidence showed that the defendant made the promise without intending to keep it. The appellate court held that this was a scheme to accomplish a fraud and affirmed a punitive damages judgment.

■ Considering the concept of a scheme, we believe that the protracted negotiations between King and Stamatakis show that a scheme was alleged and that it is a question of fact for the trier of fact to determine the ultimate issue.

■ King defends against the tort claim on two other grounds. He contends that the fraud claim is not actionable as a matter of law because King merely exercised his right under the contract to terminate the agreement upon 90-day notice to Stamatakis. The contract was terminated by King nine months after its inception. Stamatakis waived the 90-day notice requirement. King relies on the 7th Circuit United States Court of Appeals case of *Repsold v. New York Life Insurance Co.* (7th Cir. 1954), 216 F.2d 479. There the court made the statement that "one who merely exercises his legal rights is not thereby chargeable with fraud." (*Repsold v. New York Life Insurance Co.* (7th Cir. 1954), 216 F.2d 479, 486.) That statement is inapplicable to the instant case. As the *Repsold* court noted, it is not clear whether the action was in contract or in tort. The action emanated from a contract. The court analyzed it on the basis of promissory fraud. While the factual setting is not totally clear, it appears that the false representation was that the defendant would perform the contract that it entered into with the plaintiff, the representation was material, it was known to the defendant that there was no intention to perform the contract, plaintiff had a right to rely on the representation of the defendant, as a result the plaintiff was induced to sur-

render certain rights that it had under a previous contract, including pension rights, and he was injured thereby. The *Repsold* court repeated the Illinois rule that bars promissory fraud actions and held that the trial court was correct in entering summary judgment for the defendant. The facts in *Repsold* fall within the Illinois prohibition against promissory fraud and consequently the *Repsold* court affirmed the summary judgment in favor of the defendant. In doing so, it made the statement relied on by the plaintiff here. That statement was not necessary to its holding and is not binding. It is not binding, furthermore, because it is a Federal court case. The *Repsold* opinion does not treat the issue under consideration here, that is, the exception to the rule against promissory fraud if a scheme is involved.

Further, the *Repsold* case improperly relied on the Illinois cases of *Foutch v. Zempel* (1928), 332 Ill. 192, 163 N.E. 546, and *Skidmore v. Johnson* (1948), 334 Ill. App. 347, 79 N.E.2d 762. *Foutch* was not a promissory fraud case at all. In *Skidmore*, the court found that the defendant did not make any false representations. Neither *Foutch* nor *Skidmore* deals with the exception concerning a scheme.

King's third defense to the tort action is that Stamatakis has waived any right to assert the fraud claim because Stamatakis failed to disaffirm or abandon the transaction with all reasonable diligence once he learned of the facts. King notes that Stamatakis in his deposition admitted that he became aware of this undisclosed condition within a week after Stamatakis acquired Premier and he became more and more aware of it over the next eight months. King terminated his employment nine months after its inception. Nevertheless, Stamatakis formally waived the 90-day notice of the termination provided in the employment contract. Three months after termination, on the date on which Stamatakis was required to pay the second installment on the purchase agreement, Stamatakis did in fact make that installment payment.

King contends a person claiming fraud or misrepresentation must disaffirm or abandon the transaction with all reasonable diligence once that person learns of the truth. We previously addressed the issue of whether the doctrine of waiver applies to an action of fraud. In *Kaiser v. Olson* (1981), 105 Ill. App. 3d 1008, 1014, 435 N.E.2d 113, 118, we said:

> "The doctrine of waiver has worked its way over into actions at law. (D. Dobbs, Remedies, §2.3, at 44 (1973); see 'Waiver,' Black's Law Dictionary 1417 (5th ed. 1979).) It is a well-established principle that a person defrauded in a transaction may, by conduct inconsistent with an intention to sue for damages

for fraud, waive the right to sue. (37 C.J.S. *Fraud* §§69, 72 (1943); 37 Am. Jur. 2d *Fraud and Deceit* §386 (1968); Annot.) Specifically, waiver will apply if a party, after discovering the alleged fraud and with full knowledge of its material aspects, engages in conduct which is inconsistent with an intention to sue. This is particularly true when the conduct engaged in affords the defrauded party an advantage or misleads or prejudices the opposite party. (*Harris v. Egger* (6th Cir. 1915), 141 C.C.A. 219, 226 F. 389; cited in Annot., 52 A.L.R. 1153, 1156 (1928).) One is not permitted to lie back and speculate as to whether avoidance or affirmance of a contract will ultimately prove more profitable. Restatement (Second) of Contracts §381, Comment *a* (1981)."

While the principle of waiver may apply, whether it does apply is a question of fact that is not appropriately a subject for summary judgment here.

For the foregoing reasons, we find that the evidence on the count alleging promissory fraud is insufficient to warrant a summary judgment in favor of King.

The other count in the complaint alleges that King breached its contract. As required by the purchase agreement, King signed an employment contract. His duties were to be responsible for the management of the "combined manufacturing operation of Premier Engraving, Inc. and Superior/Rogers Graphics, Inc." King was to devote "his full time and best efforts to the performance of those duties." The contract was for a five-year term and provided that King would be paid an annual base salary of $100,000 per year. Prior to entering into the agreement with Stamatakis, King had provided Stamatakis with a yellow handwritten draft in his own hand proposing in part: "If King for any reason leaves the employ of Stamatakis Industries he agrees not to compete within 1,000 miles of Chicago for two years." The contract actually entered into by the parties contains this provision. The agreement also contains a mandatory "blue pencil" section in which the parties agreed that if the "duration" of any of the restrictions contained in the agreement is unenforceable, it is the intention of the parties that the restrictive covenant will not be terminated but shall be deemed amended to the extent required to render it valid and enforceable. There was also a severability clause which provided that if any provision of the contract was held invalid or unenforceable, the remainder of the agreement remained in full force and effect. If any provision was held invalid or unenforceable with respect to particular circumstances, the provision remained in full force

and effect in all other circumstances. Although the agreement was for a term of five years, the term was expressly subject to the right of either Stamatakis or King to terminate the agreement at will on 90 days' prior written notice without any showing of cause or good reason. The complaint alleging breach of contract contends that King expressly violated the employment agreement by terminating his employment within nine months, after the sale and forming his own company, King Graphics, Inc., and engaging in services in the Chicago area in competition with Stamatakis.

King contends that the restrictive covenant clause underlying the contract breach is unenforceable because it is invalid under Illinois law and consequently there is no breach of contract. More specifically, King attacks the agreement with regard to the extent of the restriction of King's activities and the geographic scope. Finally, King contends the unreasonable and unenforceable restrictions are not subject to judicial modification or partial enforcement.

As to King's activities, King contends that his duties under the agreement were to manage the manufacturing operations of subsidiaries of Stamatakis, that is, Premier and Superior/Rogers. The restrictive covenant, however, imposes another restriction which is much broader than the restriction which prohibits competing against Premier and Superior/Rogers in the graphic arts business. A paragraph in that agreement provides that King may not engage in any business or perform any service in competition with the business of the "employer." The employer under the terms of the agreement is Stamatakis Industries, Inc. Stamatakis Industries, Inc., in addition to the graphic arts business, is involved in the manufacture of furniture accessories, material-handling equipment, concrete transit mixtures, tow tractors, die handles, aluminum crucible handles, platform lift trucks and concrete products; the operation and sales and distribution facilities for those products; real estate development; and property development and rental units. Consequently, King argues, the restriction would bar King from many businesses having no connection whatsoever with the businesses that King was employed with at Stamatakis.

King argues that this makes the agreement, *per se*, unenforceable. Stamatakis responds that the word employer here contains a latent ambiguity. The graphic arts business is the business in which King has always been employed. The agreement was negotiated in connection with the sale of Premier, which was in the graphic arts business. King had never worked in any other business while with Stamatakis other than the graphic arts business. Consequently, in interpreting the restrictive covenant concerning activities, it is Stama-

takis' contention that King is only restricted from competing in the graphic arts business.

A contract is ambiguous when it is capable of being understood in more than one sense. (*Cory v. Minton* (1977), 49 Ill. App. 3d 312, 316, 364 N.E.2d 311, 314; *First National Bank v. Victor Comptometer Corp.* (1970), 123 Ill. App. 2d 335, 341, 260 N.E.2d 99, 102.) In *Cory*, the court stated that "[a] latent ambiguity occurs where a writing appears on its face clear and unambiguous, but which, in fact, may be shown by extrinsic evidence to be uncertain in meaning. Such a latent ambiguity may be demonstrated and explained by parol evidence." (*Cory v. Minton* (1977), 49 Ill. App. 3d 312, 316, 364 N.E.2d 311, 314.) The question of whether a contract is ambiguous is a question of law to be determined by the court and in making that assessment the court is permitted to admit extrinsic evidence provisionally for the purpose of determining whether an ambiguity exists. If an ambiguity appears, then the interpretation of the contract is a question of fact; if no ambiguity is present, then the interpretation is a question of law and the words of the contract must be given their ordinary meaning. (*UIDC Management v. Sears Roebuck & Co.* (1986), 141 Ill. App. 3d 227, 230, 490 N.E.2d 164, 166.) Where the facts are clear, it is the responsibility of the court to rule on the legal effect of those facts. (*United Farm Bureau Mutual Insurance Co. v. Elder* (1981), 86 Ill. 2d 339, 343, 427 N.E.2d 127, 129.) It is then the duty of the court to interpret the contract in accordance with the intention of the parties. *Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683.

We believe that there is a latent ambiguity in the contractual term of the employment agreement. The contract provides that King will not "engage in any business or perform any service, directly or indirectly, in competition with the business of Employer." The question then is, What is the business of the employer? The literal meaning of the contract would provide that the business of the employer is that of not only Stamatakis' graphic arts business but every other business that Stamatakis and its subsidiaries are engaged in. However, the contract also shows that King was hired specifically to run the subsidiaries in the graphic arts business and it is that business that Stamatakis seeks protection from the competition of King. The resolution of that ambiguity is beyond the purview of the present motion for summary judgment.

King also contends that the restrictive covenant of the post-employment agreement is invalid because the geographic scope of the restrictive covenant is too broad to have any reasonable relationship to

any legitimate interest of Stamatakis. King cites *Boyar-Schultz Corp. v. Tomasek* (1981), 94 Ill. App. 3d 320, 322, 418 N.E.2d 911, 912-13, where the defendant sold a corporation to the plaintiff and signed a covenant which prohibited the defendant from competing with the plaintiff or its subsidiaries throughout the United States and Canada. The court found that the covenant was unreasonable. King also cites *McCook Window Co. v. Hardwood Door Corp.* (1964), 52 Ill. App. 2d 278, 202 N.E.2d 36, also involving the sale of a business, where the court said that it was necessary to limit the covenant to the extent necessary for the protection of the goodwill transferred. Consequently, it could cover only the territory to which the goodwill extends and to which it might reasonably be expected to extend during the existence of the restraint. The court in *McCook* struck down the restraint proscribing competition within a 150-mile radius of the plaintiff's plant.

■ We recently addressed the issue of the geographic scope of an employment agreement and more particularly addressed it in reference to an agreement involving the sale of a business. We commented that in the sale of a business the interest to be protected is the value of the goodwill that is purchased. In protecting the goodwill sold, the courts consider the fact that the bargaining position is not uneven, as it is generally in an employer/employee relationship, and that the courts are less likely to declare the sale of a business post-employment restraint invalid. (*Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 447 N.E.2d 35.) We cannot ignore the fact that it was King himself who established the geographical limitation. King does not suggest that a more restricted limitation would be appropriate; rather, he insists that the agreement is *per se* invalid. Considering the fact that this is the sale of a business and that the geographical scope was proposed by King himself and that the issue here on the contractual damages count is whether judgment should be entered for the defendant because the agreement is invalid *per se*, we conclude that we cannot say that as a matter of law the restriction here is an unreasonable restraint of trade. Consequently, for all of the above reasons, the motion for summary judgment is reversed.

Since the summary judgment is being reversed and the cause is being remanded, we consider an issue that was raised by Stamatakis and may be an issue in the trial court, that is, whether the restrictive covenant may be pared down by the court. *House of Vision, Inc. v. Hiyane* (1967), 37 Ill. 2d 32, 225 N.E.2d 21, held that a court using its equitable powers may modify restraints embodied in a contract. That opinion cautioned that the fairness of the restraint is a relevant consider-

ation and that when the agreement is unrealistic it imposes a risk to a party proceeding at his peril or the burden of expensive litigation to ascertain the scope of the obligation. The Restatement (Second) of Contracts, section 184, provides that if part of the agreement is unenforceable a court might nevertheless enforce the balance of the agreement if the party seeking the enforcement "did not engage in serious misconduct." (Restatement (Second) of Contracts §184, at 30 (1981).) In *Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 477 N.E.2d 35, the court also considered this very issue and commented that if a party drafting the agreement is confident that the courts will pare down the agreement, they will fashion ominous covenants. Further, a court using its equitable powers should consider the relative positions of the parties, that is, was it an agreement imposed by an employer against an employee who has no bargaining power or, on the other extreme, was it an agreement fashioned by parties with equal bargaining powers such as may well be the situation involving the sale of a business. (Also see Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625 (1960).) We cannot say at this stage of the proceedings that the court does not have equitable power to modify the agreement.

Stamatakis also makes a procedural argument. King's motion for summary judgment was originally denied. The trial court proceeded and during the course of the trial the motion was renewed and then allowed. The court commented that it had made a mistake in originally denying it. On appeal, Stamatakis urges this as error. No authority is cited. More significantly, Stamatakis does not suggest what relief should be allowed. We see no authority nor any rationale and cannot fathom what relief should be allowed.

This matter is reversed and remanded to the trial court.

Reversed and remanded.

McMORROW, P.J., and LINN, J., concur.