**STAMATAKIS INDUSTRIES, INC., and Premier Engraving, Inc., Plaintiffs–Appellants, Cross–Appellees,**

v.

**Frederick KING and King Graphics, Inc., Defendants–Appellees, Cross–Appellants.**

Nos. 92–1796, 92–1810.

United States Court of Appeals, Seventh Circuit.

Submitted May 18, 1992.

Decided June 15, 1992.

John Fennig, Thomas J. Murphy, Chicago, Ill., for plaintiffs-appellants in No. 92–1796.

Marcos Reilly, Thomas F. Ging, Hinshaw & Culbertson, Chicago, Ill., for defendants-appellees in No. 92–1796.

John Fennig, Thomas J. Murphy, James M. Scanlon, Chicago, Ill., Thomas F. Reddy, Lake Worth, Fla., for plaintiffs-appellees in No. 92–1810.

Thomas F. Ging, Charles Moore, Hinshaw & Culbertson, Chicago, Ill., for defendant-appellant in No. 92–1810.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

■ Last fall we dismissed two appeals in this case because the district court had not resolved all of the issues. *Stamatakis Industries, Inc. v. J. Walter Thompson, U.S.A., Inc.,* 944 F.2d 382 (7th Cir. 1991). That court has since entered final judgment on the federal claim and dismissed without prejudice all claims dependent on the supplemental jurisdiction. Frederick King's appeal from the court's election not to dispose of these claims on the merits is unavailing. Judges may bypass state claims once they have resolved the federal ones. The district judge did not abuse that discretion, given ongoing litigation in state court presenting the same issues, *Stamatakis Industries, Inc. v. King,* 165 Ill.App.3d 879, 117 Ill.Dec. 419, 520 N.E.2d 770 (1st Dist.1987), and we say no more about King's appeal. Only four parties retain an interest in the litigation (thus the new caption), and we take up their federal dispute.

In 1981 seven firms in Chicago provided color separations to the advertising industry. An advertising agency would supply photographs, artwork, and text plus a layout, from which the separator would make four color negatives (yellow, blue, red, and black) that were used to make the printing plates for color advertisements. Preparing the films called for precise filtering (to get the colors right) and exact registration (so that when the four plates were inked in sequence, the image would appear without blurring). Sometimes the ad agencies would hire art studios to retouch the films or add special effects missing from the copy supplied to the separators. Frederick King, the principal employee (and chairman

of the board) of Premier Engraving, wanted to acquire a computer system to assist in reworking images in-house, but the price, then over $1 million, was too steep.

Stamatakis Industries, which bought Superior/Rogers Engraving Company in 1976, added Premier to its stable in 1981. King stayed on and promised not to compete in the separation business for two years should he leave Premier. King tried to persuade Stamatakis to buy computer graphics equipment, but it decided that the cost was too dear. When it became clear in the spring of 1982 that Stamatakis would not spring for the high tech gizmos, King began to think about setting up his own digital image-processing business. In April 1982 he left Premier, becoming a graphics consultant for Beatrice Foods Company. While advising Beatrice, King raised $500,-000 to buy some of the Scitex equipment he had been eyeing. King formed King Graphics, Inc., and in October 1982 set up shop in space leased from J. Walter Thompson, U.S.A., Inc., Premier's largest client. Eventually Thompson stopped sending work to Premier. When another of Premier's rainmakers quit and took the work with him, the firm's billings shrank to about $1.5 million a year, a third of its former size. Whether King's activities violated the no-competition clause is a question for the courts of Illinois. The only federal claim is that King and his firm violated the antitrust laws by conspiring with Beatrice, Thompson, and several of their employees to steal Premier's business. The district court granted summary judgment to the defendants, finding that Premier did not suffer any antitrust injury and that at all events the claim is substantively silly. We agree with both conclusions.

■ The antitrust injury doctrine of *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); and *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." *Chicago Professional Sports Limited Partnership v. National Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir.1992). Premier did not establish this. It established a decline in sales, to be sure, but a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other. If King's defection should be called unfair competition, it is nonetheless *competition*. "Competition is ruthless, unprincipled, uncharitable, unforgiving—and a boon to society, Adam Smith reminds us, precisely because of these qualities that make it a bane to other producers." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1268 (7th Cir.1992). As in *Brunswick*, the plaintiff's complaint is too much competition (injuring producers) rather than too little (injuring consumers). Entertaining claims of excessive competition would undermine the functions of the antitrust laws, a point forcefully made by a former head of the Antitrust Division. Edward A. Snyder & Thomas E. Kauper, *Misuse of the Antitrust Laws: The Competitor Plaintiff*, 90 Mich.L.Rev. 551 (1991).

■ Claims of excessive competition are especially suspect when they accuse the consumers of misunderstanding their own interests. Let us suppose that King Graphics was competing in the separations business (which it denies), that Superior and Premier should be treated as competitors despite their common ownership (implausible), and that the diversion of business to King Graphics inflicted mortal wounds on both Superior and Premier (actually both stayed in business), reducing the number of active rivals by one (subtract Superior and Premier, but add King). Such a reduction could pose a threat to consumers if new entry is difficult, for it is a little easier to organize a cartel among six firms than among seven. But in that event the victims would be the advertising agencies—J. Walter Thompson chief among them. Why would Thompson want to injure itself in this way? A theory of liability attributing irrationality to consum-

ers does not get very far. See *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983) (Breyer, J.).

Premier insists that Thompson could gain from monopoly in the separations business. Thompson bills for services on a cost-plus basis; when cost rises, the "plus" rises too. *Voilà!* Higher costs mean higher profits. We should all be so lucky. The proposition gets its force from the assumption that the markup is constant. But why should it be? If Thompson were able to extract more from its customers, it would have been able to increase the "plus" beforehand. Antitrust law does not assume stable markups. See *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Competition among advertising agencies holds markups in check. Unless demand is perfectly inelastic, the producer absorbs part of any increase in costs, with the amount absorbed depending on the ratio between the elasticities of supply and demand. That makes it hard to tell how much will be borne and how much passed on. *Illinois Brick*, 431 U.S. at 741-42, 97 S.Ct. at 2072-73; see also William M. Landes & Richard A. Posner, *Should Indirect Purchasers Have Standing To Sue Under the Antitrust Laws? An Economic Analysis of the Rule of Illinois Brick*, 46 U.Chi.L.Rev. 602, 615-21 (1979). In neither competition nor monopoly does an increase in cost lead to an increase in profit. We need not know whether competition in the advertising business is as cutthroat as the business pages suggest to know where Thompson's interests lay.

As Thompson had no reason to bring higher prices upon itself, it makes sense to infer that there was never a threat to consumers. The appearance of a new firm (King Graphics) increased competition. Other firms on the sidelines (some 50 other separators in Chicago alone stood ready to spring to the rescue of beleaguered advertising agencies), plus the ease of fresh entry, ensured the vigor of competition for the future. Chicago is not insular; people could take their business to New York (or separators based in New York could open offices in the midwest). Advertising agencies and commercial printers could (and did) have their own separation departments. Internal production is as effective as any other in driving down price.

This was an industry in technological transition. Notice the past tense in the factual narration. Computers dominate today; King guessed right, and Stamatakis wrong. Competition has flourished as every agency and printer can scan images into computers and manipulate them in novel ways with powerful software. No longer do people peer at registration marks through magnifying glasses to see whether the images line up. After artists finish with the details, computers automatically generate proper transparencies. Premier concedes that competition is vigorous today and abandoned any claim under § 2 of the Sherman Act, 15 U.S.C. § 2. Its conspiracy claim under § 1 is no different, as all the defendants supposedly agreed to do was set up King Graphics and ruin Premier. Blotting out one supplier can affect interstate commerce, *Summit Health, Ltd. v. Pinhas,* —— U.S. ——, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), but to succeed on the merits the plaintiff must show actual or potential injury to consumers. Premier did not come close. It is an abuse of the Sherman Act to depict cooperative efforts to establish a new firm as a forbidden reduction of competition.

AFFIRMED.