**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 29 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

FULL DRAW PRODUCTIONS, a
Colorado corporation,

      Plaintiff-Appellant,

v.

EASTON SPORTS, INC., a California
corporation; PAPES, INC., a Kentucky
corporation; BROWNING ARMS
COMPANY, a Utah corporation;
PRECISION SHOOTING
EQUIPMENT, a Delaware
corporation; HOYT U.S.A., INC., a
California corporation; BEAR
ARCHERY, INC., a Delaware
corporation; ACI CONSOLIDATED,
INC., a Michigan corporation;
OUTTECH, INC., a New Jersey
corporation; EHLERT PUBLISHING
COMPANY, a subsidiary of Affinity
Group, Inc.; ARCHERY
MANUFACTURING AND
MERCHANTS ORGANIZATION, a
Florida Trade Association;
SAUNDERS ARCHERY CO., INC., a
Nebraska corporation; NEW
ARCHERY PRODUCTS
CORPORATION, an Illinois
corporation; DARTON ARCHERY, a
Michigan corporation; and BEMANS
U.S.A., INC., a Utah corporation,

      Defendants-Appellees.

No. 98-1026

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 97-WY-1121-CB)**

James A. Jablonski (Harry L. Pliskin with him on the briefs), of Gorsuch Kirgis LLP, Denver, Colorado, for Plaintiff-Appellant.

John M. Peterson (Jonathan T. Howe with him on the brief), of Howe & Hutton, Ltd., Chicago, Illinois, for Defendants-Appellees.

Before **TACHA**, **EBEL** and **KELLY**, Circuit Judges.

**EBEL**, Circuit Judge.

Full Draw Productions ("Full Draw"), an archery trade show promoter, brought an antitrust suit against Easton Sports, Inc., and other co-defendants, who are archery manufacturers and distributors, a publishing company, a representative for archery manufacturers, and an archery trade association (collectively, "defendants"). Full Draw brought a private antitrust suit under Clayton Act § 4, alleging violations of Sherman Act §§ 1 & 2 from defendants' alleged group boycott of Full Draw's Bowhunting Trade Show ("BTS"). In addition, Full Draw claimed violations of Colorado antitrust laws and common-law tortious interference. The district court dismissed both federal and state antitrust claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, on the grounds that (1) Full Draw failed to allege

- 2 -

antitrust injury, and (2) Full Draw failed to plead sufficiently the elements of Sherman Act offenses. The district court then dismissed the pendant state tortious interference claim. We reverse and remand.

## BACKGROUND

**Facts**

Since this is an appeal from a dismissal under Fed. R. Civ. P. 12(b)(6), we must "accept[] the well-pleaded allegations of the complaint as true and construe[] them in the light most favorable to the plaintiff." Yoder v. Honeywell, Inc., 104 F.3d 1215, 1224 (10th Cir.) (quotations and citation omitted), cert. denied, 115 S Ct. 55 (1997). In that regard, we draw the facts from Full Draw's second amended complaint.[1]

Full Draw, a Colorado corporation, was formed to organize and present a trade show for the archery industry. In 1990, Full Draw held its first BTS, which at the time was the only merchandise mart devoted solely to archery equipment. Archery manufacturers and distributors purchased exhibition space and dealers paid a fee to attend. The corporate defendants (all defendants except the Archery

---

[1]As explained infra, Full Draw's second amended complaint was the final complaint it filed and the one ruled upon by the district court.

- 3 -

Manufacturing & Merchants Organization ("AMMO")) were, for the most part, the large manufacturers (and some distributors) of archery equipment, and they all rented space and participated in the BTS.

That same year, Full Draw entered into a five-year agreement with AMMO, a trade association to which the other defendants belonged, and in which they actively participated. Under the agreement, Full Draw paid AMMO 10% of its BTS gross revenues in exchange for AMMO's endorsement of the show.

In 1994, with support from other defendants, AMMO sought to increase to 30% its revenue share from the BTS. AMMO also discussed buying the show from Full Draw. During and subsequent to the negotiations, AMMO and other defendants threatened to boycott the BTS unless Full Draw sold the show to AMMO on terms AMMO offered. Full Draw and AMMO failed to reach an agreement.

In 1995, following the failed negotiations, AMMO and other defendants decided that AMMO would present its own archery trade show, to be held one week after the 1997 BTS. Defendants also decided to boycott the BTS in order to eliminate it as a competitor to AMMO's new trade show. In support of the boycott, defendants (1) advertised that they would attend only the AMMO trade show in 1997; (2) informed others at the 1996 BTS that they would attend only the AMMO trade show; (3) persuaded other entities into participating in the

- 4 -

AMMO show rather than the BTS by repeatedly stating that key manufacturers and distributors would not attend the 1997 BTS, and that the BTS would be a failure and probably not even occur; (4) created "a climate of fear of retribution and loss of business" for attending the BTS, and retaliated in various ways against certain businesses which attended the 1997 BTS; (5) agreed among themselves and caused other AMMO members to agree not to attend the 1997 BTS; and (6) actually boycotted the 1997 BTS.

As a result of defendants' boycotting efforts, the 1997 BTS failed financially and was eliminated as a competitor to future AMMO shows, leaving AMMO as the only supplier in the alleged market of archery trade shows in the United States.

**Procedural History**

Full Draw filed a complaint against defendants on May 30, 1997, alleging violations of Sherman Act §§ 1 & 2 as well as a supplemental Colorado state law claim for tortious interference with prospective business advantage. Plaintiff subsequently amended its complaint to include additional monopoly claims and state antitrust claims. On August 18, 1997, defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). On October 16, 1997, Full Draw sought to amend its complaint again to add four new defendants and to add allegations against

existing defendants.[2]  Existing defendants objected to the new allegations against them, so Full Draw filed a new second amended complaint limiting its new allegations to the new defendants.  Nevertheless, according to both Full Draw and defendants, the district court stated that it would consider the new allegations with respect to all defendants for purposes of the motion to dismiss, and we therefore consider all the new allegations in the second amended complaint to be directed against all defendants.

On December 23, 1997, the district court granted defendants' motion to dismiss.  The court found that Full Draw failed adequately to allege antitrust injury.  The court stated:

> Simply put, Plaintiff has alleged that Defendants' competitive acts drove it out of business, but has not alleged that those same acts caused harm to consumers or competition—and this is unsurprising where Defendants are many of the relevant consumers and their acts increased, albeit temporarily, competition.  By definition, it would seem that where a majority of consumers believe that a monopoly producer is not performing adequately and decide to provide an alternative for themselves and other consumers, there can be no antitrust injury, particularly where, as here, there have been no

---

[2]The new defendants were Saunders, NAP, Darton, and Bemans.  It should be noted that, on appeal, Full Draw omits to place these defendants' names in the caption of its opening brief.  Consequently, Darton submits a brief pursuant to 10th Cir. R. 31.3, arguing that Full Draw should be deemed to have abandoned its appeal against Darton.  However, Full Draw points out that it included Darton in its notice of appeal, and that its omission of Darton from the caption of its opening brief was inadvertent.  We decline to find that Full Draw abandoned its appeal against Darton because of a mere scrivener's error in the caption of Full Draw's opening brief.

allegations that harm was caused to any other consumers (e.g., the other exhibitors or the attendees of the shows) by reduced output or increased prices.

The district court further noted that Full Draw failed to make specific factual allegations defining the relevant product and geographic markets, the number of market participants and their relevant market shares, or defendants' market power, all of which the court considered requisite elements of Sherman Act §§ 1 & 2 offenses. The court then dismissed the state antitrust claims, finding federal and Colorado antitrust laws sufficiently analogous. Finally, because the court dismissed all federal claims over which it had original jurisdiction, the court exercised its discretion under 28 U.S.C. § 1367(c)(3) to dismiss the remaining state claim of tortious interference.

Full Draw appeals.


**DISCUSSION**


The district court had original jurisdiction over the antitrust claims pursuant to 28 U.S.C. § 1337,[3] and supplemental jurisdiction pursuant to 28

---

[3]This section states, in relevant part: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies . . . ." 28 U.S.C. § 1337(a).

U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

"We review de novo a district court's dismissal of a cause of action for failure to state a claim upon which relief can be granted." Chemical Weapons Working Group, Inc. v. United States Dep't of the Army, 111 F.3d 1485, 1490 (10th Cir. 1997). Furthermore,

> [w]e uphold a dismissal under Fed. R. Civ. P. 12(b)(6) only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief, accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the plaintiff.

Yoder, 104 F.3d at 1224 (quotations and citation omitted).

On appeal, Full Draw argues that it adequately alleged antitrust injury and the requisite elements of Sherman Act offenses. We agree, and address each issue in turn.

**I. Antitrust Injury**

**A. General Legal Standard**

Sherman Act § 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Sherman Act § 2 prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several

States." 15 U.S.C. § 2. Clayton Act § 4 creates a private cause of action for any person who has been "injured in his business or property by reason of anything forbidden in the antitrust laws," and provides for treble damages. 15 U.S.C. § 15(a).

To recover damages under § 4 of the Clayton Act, a private plaintiff must show "more than injury causally linked to an illegal presence in the market." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Rather, the plaintiff

> must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

Id. (emphasis original); accord Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 339, 344 (1990); Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 882 (10th Cir. 1997); see also Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 362, at 210 (1995) (purpose of antitrust injury requirement is to "force[] antitrust courts to connect the alleged injury to the purposes of the antitrust laws").

**B. Application**

The injury Full Draw complains of—elimination from the archery trade show business as a result of defendants' alleged boycott—is "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick, 429 U.S. at 489; Sports Racing, 131 F.3d at 882.

**1. Illegality of Group Boycott.** As an initial matter, we conclude that the second amended complaint alleges a group boycott in violation of § 1 of the Sherman Act. Classic group boycotts involving conspirators whose market position are horizontal to each other and who "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete," are generally per se illegal under § 1. Northwest Wholesale Stationers v. Pacific Stationary & Printing Co., 472 U.S. 284, 294 (1985); see Klors v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959) (finding agreement among multiple manufacturers and distributors and one retailer to boycott another retailer to be per se violation); TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1027 (10th Cir. 1992) ("A group boycott is another per se violation of section one. However, a group boycott can only exist between conspirators who compete at the same market level." (citation omitted)); Coffey v. Healthtrust, Inc., 955 F.2d 1388, 1392 (10th Cir. 1992) (same). "While the competitors need not be at the same market level as the plaintiff, there must be concerted activity between

two or more competitors at [the] same market level." Coffey, 955 F.2d at 1392 (quotations and citation omitted).[4]

In this case, defendants' alleged boycott of the BTS involved an agreement among, inter alia, members of AMMO—archery manufacturers and distributors—whose market positions are horizontal to each other as buyers of exhibition space at archery trade shows competing for dealer business. In addition, defendants allegedly controlled the essential supply of major manufacturing and distributing exhibitors necessary to enable an archery trade show to survive competitively. Further, defendants allegedly cut off this essential supply of manufacturing and distributing exhibitors for the naked purpose of destroying Full Draw as a competitor to AMMO.[5] Construing these allegations in the light most favorable to Full Draw, as we must, we conclude that they state a violation of § 1 of the Sherman Act.

Nevertheless, both the district court and defendants discredited Full Draw's

---

[4]Not all group boycotts are necessarily per se violations. See FTC v. Indiana Federation of Dentists, 476 U.S. 447 (1986); Northwest Wholesale Stationers v. Pacific Federation & Printing Co., 472 U.S. 284 (1985). For a discussion of when group boycotts are considered per se violations of Sherman Act § 1 and when they are reviewed under a rule of reason, see ABA Section of Antitrust Law, Antitrust Law Developments 100-110 (4th ed. 1997).

[5]Although the second amended complaint sometimes describes defendant manufacturers and distributors as customers, it also alleges that they supply an essential product needed to make an archery trade show successful— manufacturers and distributors displaying products at the show to attract retail dealers to attend the show.

allegations of antitrust injury because the alleged boycott, as characterized by defendants and the district court, was by customers against a producer—by buyers of archery trade show exhibition space against an archery trade show producer. Admittedly, the second amended complaint focuses on Full Draw as a supplier of exhibitor space, and one of the ways the second amended complaint characterizes the manufacturers and distributors is as customers of Full Draw who purchased that exhibition space. Viewed in that light, Full Draw's antitrust injury was experienced as a producer or supplier. The district court therefore concluded that no antitrust injury was alleged because "[a] producer's loss . . . is no concern of the antitrust laws—the antitrust laws serve to protect consumers from suppliers, rather than suppliers from one another." Defendants add that "[p]laintiff's theory makes no economic sense because the parties harmed by the alleged violation would be the Defendants' [sic] themselves" as buyers of exhibition space, and "Defendants would . . . not subject themselves to market power or an unreasonable restraint on competition." In essence, this argument asks why the defendants would conspire to destroy one of their two sources of suppliers of exhibition space (the BTS), leaving them with only one supplier (AMMO). Of course, that question is answered by the second amended complaint, which alleges that defendants controlled or influenced AMMO and, if AMMO were the only supplier of archery trade show distribution space, defendants could ensure that the

shows would be favorable to their interests.

As an initial matter, if we view the alleged group boycott as a customer boycott, that would not insulate it from the proscriptions of § 1 of the Sherman Act. We acknowledge that it is unusual for customers to boycott to drive out producers, and that "[w]henever producers invoke the antitrust laws and consumers are silent," our antitrust inquiry "becomes especially pressing." SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 965 (10th Cir. 1994) (quotations and citation omitted). However, it is clear that customers can unlawfully boycott to drive out a producer. See Blue Shield of Virginia v. McCready, 457 U.S. 465, 472 (1982) (Clayton Act § 4 "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." (quotations and citation omitted)); Reazin v. Blue Cross and Blue Shield of Kansas, Inc., 899 F.2d 951, 962-63 (10th Cir. 1990) ("In any event, as the Supreme Court has specifically held, an antitrust plaintiff need not necessarily be a competitor or consumer. Where the plaintiff's injury is so 'inextricably intertwined' or 'so integral an aspect of the conspiracy alleged' plaintiff has established an antitrust injury." (quoting McCready, 457 U.S. at 479 (citations omitted)); see also Ernest H. Schopler, Refusals to Deal as Violations of the Federal Antitrust Laws, 41 A.L.R.

- 13 -

Fed. 175, 224-25 (1979) (collecting cases finding customers unlawfully boycotted producers or other suppliers).[6]

In an analogous case, Taxi Weekly, Inc. v. Metropolitan Taxicab Bd. of Trade, Inc., 539 F.2d 907 (2d Cir. 1976), owners of taxi fleets boycotted the leading newspaper for the New York taxi industry by, inter alia, canceling their fleet subscriptions to that newspaper and supporting the formation of a rival trade paper. See id. at 908-09. The group boycott ultimately caused the demise of the once successful publication. See id. The Second Circuit upheld antitrust liability against the fleet owners under §§ 1 & 2 of the Sherman Act, finding that the fleet

---

[6]The district court's reliance on Stamatakis Indus., Inc. v. King, 965 F.2d 469 (7th Cir. 1992), and Oahu Gas Serv., Inc. v. Pacific Resources, Inc., 838 F.2d 360 (9th Cir. 1988), is misplaced. Although the Seventh Circuit stated in Stamatakis that "a producer's loss is no concern of antitrust laws," it does not preclude a producer from alleging antitrust injury as a result of customer activity. See 965 F.2d at 471. Instead, Stamatakis requires that "the plaintiff . . . show actual or potential injury to consumers." Id. at 472. As quoted infra Part I.B.2., Full Draw alleged that the boycott injures consumers as well as itself by the non-competitive elimination of the BTS as AMMO's sole rival. Thus, we do not believe Stamatakis would preclude Full Draw's allegation of antitrust injury, even if the case were controlling authority, which it is not.

Oahu Gas also does not undermine Full Draw's allegation of antitrust injury. There, the Ninth Circuit found, inter alia, that a propane gas seller did not prove any anticompetitive effects from a competitor's offer of sham low prices to the plaintiff's customers knowing that the effort would cause the plaintiff to meet the sham offer and consequently lose profits. The court found that the plaintiff did not allege anticompetitive effects from the competitor's offers of low but non-predatory prices, because the marketing scheme had the effect of increasing price competition. See 838 F.2d at 368, 370. As is apparent, Oaho Gas offers neither analogy nor language that precludes Full Draw's allegation of antitrust injury.

owners "did not simply switch their business from Taxi Weekly in search of better service; they wanted to destroy Taxi Weekly." See id. at 913.

Similarly, in the instant case, it is alleged that the archery manufacturers and distributors did not simply switch their business from the BTS to the AMMO show for legitimate business reasons, but did so out of a desire to destroy the BTS. It also was alleged that defendant manufacturers and distributors acted in combination with AMMO to boycott and destroy the BTS because Full Draw refused to sell the BTS to AMMO; defendant manufacturers and distributors did not want the competitive situation of two trade shows; and defendant manufacturers were large entities which wanted to control the trade show market in order to favor themselves over small manufacturers. A group boycott such as this, by large customers to destroy one producer of trade show services in favor of another over which it had influence and could obtain advantage at the expense of other consumers, states a violation of the Sherman Act. See id. at 913.

We observe, further, that the characterization of the boycott as a customer boycott is not the only interpretation that could be given to Full Draw's second amended complaint. This case alleges a complex, often symbiotic set of relationships between Full Draw and defendants that cannot be as easily cabined as the district court and defendants have done, particularly when viewing the second amended complaint most favorably to the plaintiff. In one regard,

- 15 -

defendant manufacturers and distributors could be viewed as suppliers and Full Draw as a customer. That is, defendant manufacturers and distributors were the suppliers of exhibitors, a commodity essential to the successful operation of a trade show. Although Full Draw did not directly buy this commodity (indeed, the manufacturers and distributors paid Full Draw for the privilege of being exhibitors), the manufacturers and distributors were paid in the currency of a forum for access to retail dealers who might purchase their archery products. Viewing the relationship between Full Draw and defendants in this light, Full Draw's alleged injury from defendant's unlawful group boycott exists at the customer level—and defendants do not dispute that a customer's injury can be antitrust injury.

Alternatively, another characterization of the second amended complaint could focus on AMMO's role in defendants' alleged group boycott. After all, the boycott of the BTS was alleged to have involved not only defendant manufacturers and distributors whom defendants and the district court characterize as customers of the BTS. The boycott also involved defendant AMMO—a direct competitor to Full Draw in the archery trade show market—and apparently other non-customer defendants (e.g., a trade publication) who had employees active in AMMO or otherwise assisted in the boycott. Defendants do not contend that a boycott by a direct competitor and others essential to the

operations of the plaintiff cannot be unlawful, and we do not believe they could make such an argument. See Northwest Wholesale, 472 U.S. at 293 ("Cases to which this Court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." (quotations and citation omitted)); Klors, 359 U.S. at 209, 212 (finding per se illegal group boycott involving a "wide combination consisting of manufacturers, distributors, and a retailer," brought about by the retailer against a competing retailer). Once again, even if the district court correctly stated the law regarding customer boycotts of a producer, Full Draw's second amended complaint would state a cause of action for antitrust injury to a competitor of defendant AMMO.

**2. Injury Reflects Anticompetitive Effects of Group Boycott.** In its second amended complaint, Full Draw made the following allegation of antitrust injury:

> The actions of Defendants unduly restrain, hinder and suppress competition between FDP [Full Draw] and Defendant AMO [sic] trade show in the trade show business and interstate commerce. The actions of Defendants have directly and proximately caused "anti-trust injury" because they have resulted in elimination of FDP as an exhibitor, thereby directly and substantially reducing "output" of exhibitor space and directly and substantially reducing the ability of the consumers of such space to purchase exhibitor space and display their products and services, and archery dealers from purchasing admission to such an exhibition for the purpose of viewing products

- 17 -

and services and otherwise transacting business. Because FDP produced one of only two archery business trade shows in the United States, the purposeful and wrongful destruction of FDP's business by Defendants directly injured competition as well as injuring FDP.

This allegation adequately states that Full Draw's injury "reflect[s] the anticompetitive effect" of the illegal boycott, being "the type [of injury] the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick, 429 U.S. at 489; accord Sports Racing, 131 F.3d at 882. The allegation describes the anticompetitive effect of the boycott to be the loss of competition through the elimination of AMMO's sole archery trade show competitor and the resultant loss in exhibition space output. See Herbert Hovenkamp, Antitrust Law, ¶¶ 1901a & 1901d, at 184-87 (1998) ("market output—assuming it can be determined—is a good measure of the amount of competition").[7] The second amended complaint further alleges harm to consumers from the drop in exhibition space output (reducing choice for exhibitors) and shows (reducing choice for dealers). See SCFC, 36 F.3d at 965 ("To be judged anticompetitive, the agreement must actually or potentially harm consumers.")[8]

_____

[7]This allegation answers the district court's statement that Full Draw failed to allege "any harm to consumers or competition through reduced output or increased prices."

[8]Of course, in the words of SCFC, an agreement need not "actually" harm consumers directly to be considered anticompetitive. SCFC, 36 F.3d at 965. An

(continued...)

We have no doubt that alleging the loss of one of two competitors in this case alleges injury to competition. While it is axiomatic that the antitrust laws "were enacted for 'the protection of competition not competitors,'" Brunswick, 429 U.S. at 488 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)), the instant case is not one in which it is alleged that a competitor fell prey to competition; it is one in which it is alleged that competition fell prey to a competitor. The competitor was AMMO, which through an alleged boycott by the trade association and various of its members reduced the number of competitors in the market from two to one, thereby decreasing competition and harming consumers.

In particular, as alleged in the second amended complaint, from 1995 to 1997, both AMMO and the BTS competed for customers for their 1997 trade shows. Thus, from the market's perspective, there were actually two competitors during that period. As a direct result of defendants' boycott, Full Draw was driven from the market in 1997, thereby depriving consumers of their pre-existing choices in that market. Because defendants' alleged boycott reduced a competitive market of two producers to a market of one monopolist, Full Draw quite clearly alleged substantial injury to competition from defendants' group

_____

[8](...continued)
agreement that harms a producer may "potentially harm[] consumers" downstream, id., and thus may be anticompetitive.

- 19 -

boycott.

What is more, we find it hard to imagine a closer connection between anticompetitive effect and injury than the destruction of the BTS (Full Draw's injury) and the loss of competition in the archery trade show market (the anti-competitive effect of defendants' boycott). Full Draw's alleged loss "stems from a competition-reducing aspect or effect of defendant's behavior," and accordingly is antitrust injury. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990).

We are not persuaded by the arguments to the contrary. The district court and defendants state that Full Draw did not allege any anticompetitive effect from the group boycott because the number of competitors before and after the boycott remained the same, and therefore consumers were no worse off from defendants' boycott. We disagree. The mere fact that the number of competitors after the boycott matches the number before the boycott does not cure the anticompetitive effect of the boycott, which is the elimination of a competitor by means other than "the economic freedom of participants in the relevant market." Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 538 (1983); see Taxi Weekly, 539 F.2d at 912-13 (rejecting argument that "no diminution of competition resulted from the demise of Taxi Weekly" merely because, after the boycott of the paper in favor of a rival publication, "the New

York taxi industry had the same number of trade publications as before, i.e., one"). There is no antitrust safe harbor for violations that happen to conserve the pre-offense number of competitors. Regardless of such conservation, consumers suffer because the market make-up changed as a result of inefficient anticompetitive means.

In a related point, the district court and defendants reason that defendants' alleged activities were not anticompetitive because defendants actually increased the output of exhibition space, albeit briefly, and because the output of exhibition space merely returned to the pre-boycott level after the BTS failed (i.e., exhibition space offered by one show per year). Again, we disagree. The effect of defendants' alleged boycott was not to increase competition between the two trade shows, but rather to distort and ultimately reduce competition by destroying one source of output (the BTS) and thereby limiting consumer choice to the other source of output (AMMO's show). Of course, pursuant to our reasoning above, the bare fact that the output of exhibition space before and after the alleged boycott stayed the same says nothing about whether the process in between was anticompetitive, which it allegedly was.

Therefore, we hold that Full Draw adequately alleged antitrust injury as a result of defendants' alleged group boycott. Our finding inures to Full Draw's Sherman Act § 1 claim as well as to its § 2 claims, because both sets of claims

arise from the same alleged boycotting activities and involve the same alleged source of injury to Full Draw and to competition—the unnatural demise of the BTS at the hands of defendants.

## II.  Sherman Act Pleading Requirements

As noted, the district court dismissed Full Draw's second amended complaint on another ground: "Plaintiff has failed to make specific factual allegations defining the relevant product and geographic market, the number of market participants and their relative shares, or Defendants' market power." Finding these shortcomings, the district court concluded that Full Draw failed to plead the requisite elements of Sherman Act §§ 1 & 2 offenses.  Although Full Draw's second amended complaint is hardly a model of clarity or thoroughness, we disagree with the district court and hold that Full Draw adequately pled the requisite elements of its Sherman Act claims.

In TV Communications, we stated:

Although the modern pleading requirements are quite liberal, a plaintiff must do more than cite relevant antitrust language to state a claim for relief.  A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws.  Conclusory allegations that the defendant violated those laws are insufficient.

964 F.2d at 1024 (citation omitted).  In the end, "[w]hat is determinative is

whether . . . it cannot be said that defendants did not have fair notice of [the plaintiff's] claims." Monument Builders of Greater Kansas City, Inc. v. American Cemetery Assn. of Kansas, 891 F.2d 1473, 1481 (10th Cir. 1989). We now address in turn the pleadings underlying each of Full Draw's Sherman Act claims.

First, to state a claim for a Sherman Act § 1 violation, "the plaintiff must allege facts which show: the defendant entered a contract, combination or conspiracy that unreasonably restrains trade in the relevant market." TV Communications, 964 F.2d at 1027. We find that Full Draw sufficiently pled its Sherman Act § 1 claim. As detailed supra Part I, the second amended complaint factually alleges that defendants conspired and combined in various ways to boycott the BTS and thus unreasonably restrain trade in the archery trade show market in the United States. This is sufficient to state a § 1 claim. Id. at 1027.

Second, to state a claim for attempted monopolization under Sherman Act § 2, the plaintiff must plead: "(1) relevant market (including geographic market and relevant product market); (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt." Id. at 1025 (quotations and citations omitted). We find that Full Draw sufficiently pled the elements of attempted monopolization under Sherman Act § 2. The second amended complaint alleges the relevant market to be archery trade shows in the United States. This claim is supported by factual

allegations detailing the distinct nature of the archery trade shows, their difference from gun shows, which focus only in limited part on archery, and their ability to draw a customer base of archery manufacturers, distributors, and dealers over the years. In addition, the second amended complaint alleges a dangerous probability of success in monopolizing the relevant market. Factors to be considered in determining dangerous probability include the defendant's market share, "the number and strength of other competitors, market trends, and entry barriers." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 894 (10th Cir. 1991). The allegation that defendants' boycott eliminated the only competitor to defendant AMMO's trade show demonstrates a significant entry barrier in the boycott itself, and confirms the dangerous probability of success from defendants' alleged attempt to monopolize the market. The second amended complaint also alleges specific intent on the part of defendants to monopolize the relevant market, in order to destroy the BTS and create a monopoly for AMMO. Finally, the second amended complaint alleges conduct in furtherance of the attempt, namely, the defendants' boycotting activities. Together, these allegations sufficiently plead the requisite elements of attempted monopolization.

Third, to state a claim for conspiracy to monopolize under Sherman Act § 2, the plaintiff must plead: "conspiracy, specific intent to monopolize, and overt acts in furtherance of the conspiracy." Monument Builders, 891 F.2d at 1484. We find

- 24 -

Full Draw sufficiently pled its conspiracy to monopolize claim. The second amended complaint alleges that defendants agreed to eliminate the BTS through a group boycott and other conspiratorial actions so that AMMO alone could produce archery trade shows, and that defendants participated in boycotting and other anticompetitive activities in furtherance of their conspiracy.

Fourth, to state a monopolization claim under Sherman Act § 2, the plaintiff must plead: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." TV Communications, 964 F.2d at 1025 (quotations and citations omitted). We find Full Draw sufficiently pled its monopolization claim. The second amended complaint alleges that defendants obtained monopoly power. Monopoly power requires proof of both power to control prices and power to exclude competition. See Reazin, 899 F.2d at 967; Shoppin' Bag of Pueblo, Inc. v. Dillon Cos., Inc., 783 F.2d 159, 163-64 (10th Cir. 1986). The second amended complaint's allegation that defendants' boycott successfully drove Full Draw from the market illustrates defendants' ability to exclude competition against AMMO's trade show. Additionally, because AMMO is now the sole producer of archery trade shows, AMMO and its members have the power to control prices in the market. Thus, the second amended complaint alleges that defendants possess the

components of monopoly power. Finally, the second amended complaint alleges that defendants wilfully obtained that power as a consequence of their unlawful boycott and other wrongful conduct rather than a superior product, business acumen, or historic accident. As a result, Full Draw has adequately pled its monopolization claim.

## CONCLUSION

Because we hold that Full Draw has alleged antitrust injury for purposes of Clayton Act § 4 and has adequately pled the requisite elements of its Sherman Act claims, we REVERSE the district court's dismissal of Full Draw's federal antitrust claims. Furthermore, because the district court dismissed Full Draw's state antitrust claims pursuant to its federal antitrust analysis, we REVERSE the district court's dismissal of Full Draw's state antitrust claims. Lastly, because the district court dismissed Full Draw's state tortious interference claim under the assumption that all the federal claims over which it had original jurisdiction had been disposed of, we REVERSE the district court's dismissal of Full Draw's tortious interference claim. We REMAND the case for proceedings consistent with this opinion.