**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 307, PLUMBERS, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPE FITTING INDUSTRY OF the UNITED STATES AND CANADA (AFL–CIO), et al., Respondents.**

**No. 71–1660.**

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1972.

Decided Aug. 24, 1972.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert A. Giannasi, Peter G. Nash, Gen. Counsel, Thomas E. Silfen, Attys., N. L. R. B., Washington, D. C., for petitioner.

Bernard M. Mamet, Chicago, Ill., for respondent.

Before SWYGERT, Chief Judge, and CUMMINGS and SPRECHER, Circuit Judges.

SWYGERT, Chief Judge.

This is an application by the National Labor Relations Board for enforcement of its order directed against Local 307, Plumbers, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO (hereinafter, "Plumbers"); Local 697, International Brotherhood of Electrical Workers (hereinafter, "Electrical Workers"); and Northwestern Indiana Building and Construction Trades Council, AFL–CIO (hereinafter, "Council"). The Board's Decision and Order were issued on December 31, 1970 and are reported at 187 N.L.R.B. No. 94 (1971).

The trial examiner found that respondent union violated section 8(b)(4)(i)(B) and 8(b)(4)(ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i)(B) and (ii)(B), by picketing for the proscribed object of forcing a neutral general contractor to cease doing business with the subcontractor with whom respondents had a labor dispute. The Board affirmed the trial examiner and adopted his findings of fact and conclusions of law, one Board member dissenting.

The facts which follow are those found by the trial examiner and are essentially undisputed. For several years prior to 1969, the Plumbers had been involved in a continuing labor dispute with Meyer Plumbing, Inc. (hereinafter, "Meyer") concerning Meyer's failure to employ union members and pay the prevailing wage in the area. On September 26, 1969 neutral general contractor Vail Rubber Products Corporation (hereinafter, "Vail") engaged Meyer as a subcontractor for the installation of plumbing fixtures at a planned warehouse facility. A few days later, Vail subcontracted the concrete flooring work to Hobbs Concrete Construction Co., Inc. (hereinafter, "Hobbs") and the electrical work to A & W Electrical Service, Inc. (hereinafter, "A & W"). The plumbing and concrete work began at the jobsite around October 14, 1969.

On or about October 21 Plumbers' business agent George McCarthy noticed a Meyer truck at the jobsite while he was checking a unionized construction project across the street. McCarthy immediately called the Plumbers' attorney to find out if could put up a picket line protesting Meyer's wages and working conditions.

The following day, Sam Spitale, president of the Council (a multi-union group including both the Plumbers and Electrical Workers) called Vail president William Boyd and asked who his subcontractors were. When Boyd told him, he remarked that Hobbs and A & W were "fair" contractors but that Meyer was not. Spitale explained that a "fair" contractor was someone who was "fair with us" and who "paid the prevailing wages established in the area," whereas Meyer hired "foreigners" and did not pay them more than $4.00 an hour. Spitale offered to send Boyd a list of the "fair" plumbers and of the "fair" contractors for jobs which had not yet been subcontracted; Boyd expressed no objection. Spitale then mentioned that there would be a meeting of the Council that evening and that the matter of Boyd's plumbing subcontractor was sure to come up.

The following day, October 23, the Plumbers began picketing the jobsite with signs which read as follows:

Meyer Plumbing
— Inc. —

Fails to Meet Prevailing
Wages and Conditions

This Notice
is addressed only to the Public. It is not addressed to any employers or employees, nor is anyone asked to cease doing business with anyone. Please read handbill [1] which spells out purposes of patrolling.

---

1. The handbill distributed by the picketers said:

The peaceful patrolling is being done by Plumbers Local Union No. 307 of the AFL–CIO. As a union we are, of course, pro-union but this is not why we are picketing. True, we always like to see members of the union employed not only because they are our members, but also because we know that as the result of their intense training and experience and the completion of a five-year apprenticeship program these men are qualified to give the finest service and perform work with the expert craftsmanship which they have learned. But we have an additional interest in our area. We believe it is our obligation along with other residents of the area to maintain a certain standard of living. A standard of living comes from wages and conditions and we believe the wages and conditions which permit the maintenance of our standard of living and your standard, are those which prevail in the general area. Once these wages and conditions which prevail are reduced this means that the standard of living is reduced and it is not only reduced for the mechanic but it is reduced in the entire community as well because the merchant, the professional man and anyone whose business is dependent upon the prevailing wage of the mechanic is hurt when prevailing wages are not met. And, this is why we are patrolling. Meyer Plumbing, Inc. is not meeting prevailing wages and conditions and this, in our opinion, represents a threat to the entire community.

This notice is addressed only to the public. It is not addressed to any employers or to any employees. There is no intent or attempt to induce or encourage

### PLUMBERS
### Union 307
### AFL–CIO

Boyd visited the jobsite that afternoon and observed the pickets. He then spoke to Jim Hobbs, his concrete subcontractor, who informed him that union business agents had visited that day and that Hobbs would have to stop its concrete work as soon as its men finished unloading a truck at the site.

Later that afternoon, Spitale called Boyd and told him that the matter of his plumbing subcontractor had come up at the Council meeting and "the men were very angry." Boyd replied that that was evident from the presence of the pickets. Spitale said he would have Plumbers' business agent McCarthy give Boyd a list of "fair plumbers." When McCarthy called the following day with his list of "fair plumbers," Boyd asked about four other plumbing subcontractors from whom he had received bids, and McCarthy told him that they were all "fair." Boyd then told McCarthy that their bids had been two or two and one-half times higher than Meyer's bid and asked McCarthy what he meant by a "fair" plumber. McCarthy explained that he meant "fair with us," but agreed that under the circumstances there was no reason to send the list. The conversation thus ended, the picketing continued and no more work was done by Hobbs or A & W.

On November 5 Boyd went to the Electrical Workers Hall for the meeting with Spitale, McCarthy, and Harold Hagberg, business manager of the Electrical Workers. Boyd explained his warehouse project, mentioning that he was new at general contracting, and then referred to the Meyer plumbing subcontract and the problems caused by the picketing. Spitale told Boyd that members of the unions represented at the meeting would not work with Meyer plumbers because he did not pay the prevailing wage and because his plumbers did not have the skill acquired by men who had completed the Plumbers' apprentice course. Boyd replied that he should have been told when he was soliciting bids in June that there were certain subcontractors with whom the employees of other subcontractors would not work, so that he could have made his choice with that in mind. Boyd then asked "if Meyer was not on the job, would there be a picket?" McCarthy replied that if Meyer were not on the job there would be no reason for picketing. After some further discussion to the effect that prevailing wages were union wages and that Meyer did not pay them, Boyd asked if the pickets would be removed if Meyer paid the prevailing wage. McCarthy replied that they would be removed if such were proven to him.

Hagberg then asked Boyd if he would be willing to cancel the Meyer contract and give the balance of that work to a "fair" plumber. Boyd replied that that was not a "fair" question and that there must be some other alternative. Hagberg asked McCarthy if he knew of any other solution, and McCarthy replied that "I can't think of any other solution other than to cancel the contract with Meyer and place the balance of it with a fair plumber."

Spitale asked whether Boyd would object to placing the remaining subcontracts with "members of the Building Trades," to which Boyd replied that he would not hesitate to do so if the bids were competitive. The union representatives then held a private caucus, after

employees of any employer, or any person to engage in a refusal to work, transport, or otherwise handle or work on any goods, materials and so on. No one is requested to cease performing any services. No one is requested to cease doing business with any one person. There is no intent to have any particular work assigned to anyone, nor is there an intent to seek recognition or start bargaining.

We believe that the people in this area should be familiar with what is going on and that is the sole purpose of patrolling. Plumbers Local Union No. 307 Affiliated with A.F.L.–C.I.O.

which Spitale reported to Boyd. The testimony is contradictory as to the nature of this discussion. Spitale testified that he said that the way to remove the pickets was to get proof that Meyer was paying the prevailing wage. Boyd testified that he was told that the only solution was to cancel the Meyer contract and give the balance of the work to a "fair" plumber. Boyd replied that he did not think that to be a fair solution, any more than it would be fair to cancel all the contracts with union subcontractors and give the balance to nonunion subcontractors. McCarthy then showed Boyd a list of the "fair" plumbers, and Boyd indicated that some of them had bid.

At this point McCarthy and Hagberg had to leave, so Spitale suggested that Boyd should "sleep on it" for a few days. Boyd replied that McCarthy should sleep on it and perhaps Spitale could prevail on him to remove the pickets. When Spitale called Boyd a few days later, Boyd said that no progress had been made and that he had gone to see the National Labor Relations Board.

On December 9 after the General Counsel of the Board was denied an injunction by the United States District Court for the Northern District of Indiana against the respondents' picketing, Boyd notified the respondents that Meyer's contract had been cancelled. The picket line was immediately removed by the Plumbers, and the work was subcontracted to another plumber a few weeks later.

Section 8(b)(4)(B) of the National Labor Relations Act makes it an unfair labor practice for a union or its agents:

(i) . . . to induce or encourage any individual employed by any person . . . to engage in, a strike . . .; or

(ii) to threaten, coerce, or restrain any person . . . where in either case an object thereof is—

\*   \*   \*   \*   \*   \*

(B) forcing or requiring any person . . . to cease doing business with any other person . . . .; *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any . . . primary picketing.

These provisions reflect "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." NLRB v. Denver Bldg. and Trades Council, 341 U.S. 675, 692, 71 S. Ct. 943, 953, 95 L.Ed. 1284 (1951). The purpose of section 8(b)(4)(B) is explained in NLRB v. Local 825, Int'l Union of Operating Eng'rs, 400 U.S. 297, 302–303, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971):

Congressional concern over the involvement of third parties in labor disputes not their own prompted § 8(b)(4)(B). This concern was focused on . . . pressure brought to bear, not "upon the employer who alone is a party [to a dispute], but upon some third party who has no concern with it" with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands.

Section 8(b)(4)(B) is, however, the product of legislative compromise and also reflects a concern with protecting labor organizations' right to exert legitimate pressure aimed at the employer with whom there is a primary dispute. (footnotes omitted).

■ The line between legitimate "primary" activity directed against the offending employer and unlawful "secondary" activity directed against the neutral employer with whom the union has no dispute is often difficult to discern in a "common situs" case such as presented here. But, "however difficult the drawing of lines more nice than obvious, the statute compels the task." Local 761, Int'l Union of Elec. Workers

v. NLRB, 366 U.S. 667, 674, 81 S.Ct. 1285, 1290, 6 L.Ed.2d 592 (1960).

In Sailors' Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547 (1950), the Board formulated certain standards for legitimate picketing at sites where employers other than primary employers are performing tasks. Those standards are: (1) that the picketing be limited to times when the situs of dispute was located on the secondary premises, (2) that the primary employer be engaged in his normal business at the situs, (3) that the picketing take place reasonably close to the situs, and (4) that the picketing clearly disclose that the dispute was only with the primary employer.

■ The Supreme Court in *Electrical Workers* in applying those standards stated that their observance would be "presumptive of valid primary activity" 366 U.S. at 677, 81 S.Ct. 1285, but then made clear that they should not be applied mechanically. Thus, if the union's purpose in picketing were to coerce the secondary employer, and that purpose were communicated to the secondary, formal compliance with the standards will not immunize a union or its agents from an action under section 8(b)(4)(B). For, as the Board said in Millwrights Local 1102, 155 N.L.R.B. 1305, 1309 (1965), the "totality of a union's conduct in a given situation may well disclose a real purpose to enmesh neutrals in a dispute, despite literal compliance with the Moore Dry Dock standards." A number of courts have adopted this approach. *See, e. g.*, IBEW Local 480 v. NLRB, 134 U.S.App.D.C. 178, 413 F.2d 1085 (1969); NLRB v. Northern California District Council of Hod Carriers, 389 F.2d 721 (9th Cir. 1968).

■ It has been argued that the instant case presents precisely that kind of situation. We agree. The Board adopted the trial examiner's ultimate finding that the picketing was designed "to force Vail to cancel the Meyer contract, thereby forcing it to cease doing business with Meyer." Substantial evidence supports that finding. We so conclude notwithstanding the fact that the declared purpose of the picketing was to force Meyer to meet the prevailing wage standards of the area and that the picketing formally met the *Moore Dry Dock* criteria. If that were its sole aim the picketing would have easily been sanctioned by the Board. *See, e. g.*, Int'l Hod Carriers, Local 41, 133 N.L.R.B. 512 (1961); IBEW, 145 N.L.R.B. 1163 (1964); Plumbers Local 307, 146 N.L. R.B. 888 (1964).[2]

In this case, however, regardless of the surface legitimacy of the picketing, respondents' agents disclosed to Boyd that one if not the most important purpose of the picketing was to pressure Vail into cancelling its contract with Meyer. The effect of these disclosures on Boyd was to convert an ostensibly legal activity directed at the primary employer to an illegal activity directed at the secondary employer. Spitale, the Council's president, called Boyd, saying that Meyer was "unfair" in that he failed to pay prevailing wages and then offered to provide Boyd with a list of "fair" plumbers. This statement is meaningless unless it was intended to persuade Vail to substitute a "fair" plumber for Meyer. The picketing

---

2. Although the trial examiner concluded that employees of neutral subcontractors were induced to withhold their services, the Board rejected that finding. Furthermore, a stipulation signed by the parties in the district court case reads in pertinent part: "The parties argee that the employees of Hobbs were already on the job site when picketing commenced, and that no representative of any of these Respondent Unions spoke with any employee, officer or agent of Hobbs. Petitioner (Board) admits that when a labor organization engages in lawful primary picketing, the fact that employees of other (secondary) employers working at the job site (such as employees of Hobbs) cease working at the job site in response to picketing, it does not, in and of itself, render the picketing unlawful. In other words, under said circumstances, the 'effect' of the picketing is not material and not to be considered. . . . ."

started the next day; at the same time, Spitale followed up his initial call, telephoning Boyd to say that "the men were very angry" about Meyer's continuance as subcontractor and that the Plumbers' business agent, McCarthy, would send Boyd a list of "fair" plumbers. The following day McCarthy called Boyd and indicated that he had such a list. The conversation ended, however, when Boyd stated that some of the bids of the "fair" plumbers were higher than Meyer's bid.

On a subsequent date a meeting was arranged between the union agents and Boyd. During the meeting, Hagberg, the business manager for the Electrical Workers asked Boyd if he would be willing to cancel the contract with Meyer and give the remaining work to a "fair" plumber. Boyd replied that this was not a "fair" question, that there must be some other alternative. Hagberg asked McCarthy if he knew of any other solution. McCarthy replied that he could think of none except to replace Meyer by a "fair" plumber.

When the foregoing circumstances are considered, there can be little doubt that the picketing was principally directed at effectuating Meyer's removal from the job. The picketing continued, the employees of the other subcontractors honored the picket line, and eventually the object was accomplished. Vail cancelled Meyer's contract and immediately the picket line was removed.

Respondents argue that the picketing is legal principally because it meets the standards outlined in *Moore Dry Dock*. They characterize the subsequent conversations with Boyd as "friendly conversations" initiated by the neutral employer which, as such, cannot transform a legal picketing into an illegal one. They suggest that the Board's findings result from an impermissible bootstrap argument in which the Board is confusing the unintended, though well-nigh inevitable effects of the picketing, with its objects.

The vice of this analysis is that it overvalues compliance with *Moore Dry Dock* standards and substantially undervalues the importance of the surrounding circumstances. The effects of picketing can be channeled in many directions depending in part upon compliance at the site of the picketing with *Moore Dry Dock* and in part upon the activities of the union outside the immediate area. The conversations and the meetings between the union officials and Boyd constituted conduct as much as that which occurred on the picket line. The union's conduct in this instance directly communicated to Boyd one of the purposes of picketing, namely, Meyer's removal. As the General Counsel points out, the picketing coupled with the direct appeals to the neutral employer constitute the kind of "restraint" which the statute was designed to prevent.

In addition, as a matter of law, this combination of conduct constituted the inducement and encouragement of those employed by neutral subcontractors to "engage in a strike" the object of which was illegal.

The order of the Board will be enforced.