In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-1389

TRI-GEN INCORPORATED, doing business
as GENERAL DRILLING, INCORPORATED,

*Plaintiff-Appellant,*

*v.*

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 150, AFL-CIO,
WILLIAM E. DUGAN, and KEVIN TROGLIO,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 03 C 9—**Allen Sharp**, *Judge.*

ARGUED SEPTEMBER 27, 2005—DECIDED JANUARY 18, 2006

Before FLAUM, *Chief Judge*, and BAUER and SYKES,
*Circuit Judges.*

BAUER, *Circuit Judge.* Tri-Gen Incorporated ("General
Drilling") sued International Union of Operating Engineers,
Local 150, AFL-CIO ("Local 150") in district court for
federal labor and antitrust violations. Local 150 moved for
dismissal and summary judgment on all counts. The district
court ruled in favor of Local 150 and entered judgment as
a matter of law. We affirm.

## I. Background

General Drilling is a non-union company that owns large drill rigs and drills blast holes for limestone quarries in Indiana, Kentucky, Tennessee, and Illinois. Drilling blast holes is the first step in the process of mining limestone from a quarry. The following people hold high-ranking positions at General Drilling: William Boatman is president, David Keil is a director, and Catherine Diehr is secretary, controller, and treasurer. Chicago companies, such as Raimonde Drilling (Raimonde), Ludwig Explosives (Ludwig), Callahan & Schoe, and Lambert Drilling also subcontract to drill blast holes. These four are known collectively as "the Chicago union drillers." A Wisconsin driller, Finn Drill, also competes with General Drilling and the Chicago union drillers for drilling work.

Local 150 is a labor organization that represents employees in the material production industry in northwest Indiana, northern Illinois, and northeast Iowa. The Northern Illinois Material Producers Agreement ("NIMPA") is a multi-employer association collective bargaining agreement between material producers and Local 150. All of the Chicago union drillers and Finn Drill are signatories to the NIMPA. Unlike its competitors, General Drilling has not signed the NIMPA. Kevin Troglio serves as the agent for Local 150 members employed by Raimonde, Ludwig, Callihan & Schoe, and Finn Drill. He is authorized to represent any Local 150 member employed by a signatory contractor if that contractor performs work in his jurisdiction.

Quarry owners in northwest Indiana include Vulcan Materials (Vulcan), Prairie Materials (Prairie), Northern Indiana Materials Company (Northern Indiana), and Material Service. Material Service has operated quarries in northwest Indiana since approximately 2000, when it purchased three quarries. The following people serve in

high-ranking positions for Material Service: David Olson is senior vice president of operations, Michael Bernardi is vice president for human resources and administration, Scott Jorns is manager of drilling and blasting, and Rick McElfresh is a superintendent.

Material Service does its own drilling at its quarries in northeast Illinois, but not at its northwest Indiana quarries. When Material Service originally purchased the Indiana quarries, General Drilling was doing the drill work. After the purchase, Material Service decided to continue using General Drilling as the contract driller for the quarries because, under Boatman's leadership, General Drilling had performed satisfactory work. Material Service is a signatory to the NIMPA. Material Service also had a separate collective bargaining agreement with Local 681, International Union of Laborers (Laborers) for its employees who do drilling work.

In 1996, Troglio met with General Drilling officials Boatman, Diehr, and Keil to discuss the company's drill work at quarries near Manteno, Illinois, owned by Vulcan and Prairie. Troglio stated that he wanted General Drilling to "be Union or be out" of Illinois. He also stated that General Drilling was not paying the prevailing area wage. Boatman disagreed. Troglio also stated that he was "under pressure" from the Chicago union drillers. Shortly thereafter, General Drilling decided to relinquish its drilling work in Illinois. After General Drilling left, Ludwig took over the work at the Manteno quarries.

On March 29, 2002, Local 150 sent a letter to General Drilling claiming that General Drilling was engaged in the construction industry and was paying wages below those established in the area by Local 150. Local 150 also threatened pickets to advertise to the public the inadequate wages. After receiving the letter, General Drilling officials met with Troglio on two occasions in the spring of 2002 to

discuss the company's operations in northwest Indiana. General Drilling secretly recorded the two meetings. At the time, General Drilling was drilling blast holes on a subcontract basis at quarries throughout Indiana at quarries owned by Vulcan, Northern Indiana, and Material Service. Again, Troglio voiced his concern that General Drilling was not paying the area wage according to the NIMPA and was not "on the same playing field as those people within our jurisdiction." General Drilling was reluctant to sign the NIMPA because it would have, as Diehr testified, "hugely" increased General Drilling's labor costs. Boatman for his part argued that General Drilling paid its employees more in wages and benefits than quarry employees who do drill work. Again, there was talk of pressure from the Chicago union drillers.

Troglio faxed a copy of the March 29th letter to Material Service, with the added note: "Please review and any support would be appreciated. Any questions please call." After receiving the letter, Olson and Bernardi decided to develop a plan in case it became necessary to terminate General Drilling. Olson instructed Jorns "to put a Plan B together" to solicit bids from alternate drillers. All involved Material Service officials testified that they developed the Plan B because they wanted to avoid interference with Material Service's production and sales. Initially, Jorns selected two drillers, Ludwig and Raimonde, as possible replacements and received bids from them. Jorns approved Ludwig, the lower bidder, as the replacement on June 27, 2002. Material Service officials testified that Troglio was not involved in the development of Plan B or in the selection of the alternate driller.

Troglio met with Material Service employees twice, once in May or June and again in June or July of 2002. At those meetings, he explained his intention to start organizing against General Drilling and informed them of the pos-

sible picket. He also educated them of their rights to cross the picket line. On July 16, 2002, Troglio received final authorization for the picket.

In August, McElfresh suggested to Boatman that he lease his equipment to a new driller so that the work could continue uninterrupted. After Boatman told him that he would be contacted, Finn Drill's president, Pat Garvin, called McElfresh to schedule an appointment to view the facility. Boatman had worked out a deal with Finn Drill whereby the same equipment and personnel could operate at the quarry under the Finn Drill name. Garvin toured the quarry on August 14, 2002, and later that week came in with the lowest bid. Finn Drill bid at $1.75 per foot, the same rate that Material Service had paid to General Drilling.

On August 15, 2002, Troglio sent a second letter to Material Service describing its labor dispute with General Drilling and notifying it of a possible common situs picket. Attached to this letter was a list of some Chicago union drillers. Both Ludwig, Jorns' original alternate driller, and Finn Drill, the ultimate replacement, were on the list. Troglio testified that he sent the list to quarry owners that requested information about possible union drillers.

On August 23, 2002, Local 150 picketed the Babcock quarry in Rennselaer while General Drilling was working there. Local 150 displayed a notice mentioning General Drilling's substandard wages and benefits. That same day Material Service terminated General Drilling and replaced it with Finn Drill. Material Service officials testified that, had it not been for these pickets, General Drilling would still be drilling for the company. Material Service twice invited General Drilling back to drill at its quarries, in the spring and fall of 2003. General Drilling continues to work in northwest Indiana, at the Vulcan and

Northern Indiana quarries, and to solicit business in northwest Indiana.

General Drilling sued Local 150, alleging that: (1) Local 150 conspired to restrain trade in violation of the Sherman Act; and (2) Local 150 engaged in unlawful picketing against General Drilling and Material Service in violation of Section 303 of the Labor Management Relations Act (LMRA). Defendants moved to dismiss and for summary judgment on all counts. The district court ruled in favor of defendants on January 18, 2005, and plaintiff appealed.

## II. Discussion

The district court considered defendants' motions to dismiss and for summary judgment together, and did not clarify which motion it granted in defendants' favor. Where, however,

> matters outside the pleadings were presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(b). Adequate notice is provided when the moving party frames its motion in the alternative as one for summary judgment. *See, e.g.*, *Groden v. Random House, Inc.*, 61 F.3d 1045, 1053 (2d Cir. 1995); *Madewell v. Downs*, 68 F.3d 1030, 1048 (8th Cir. 1995); *Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 722 (N.D. Ind. 1996). Here, Local 150 filed both a motion to dismiss and a motion for summary judgment. Accordingly, both parties argued on appeal under the summary standard.

We review the district court's grant of summary judgment *de novo. R.J. Corman Derailment Servs., LLC v. Int'l Union*

*of Operating Engineers, Local 150*, 422 F.3d 522, 525 (7th Cir. 2005). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Landgrebe Motor Transp., Inc. v. District 72, Int'l Assoc. of Machinists*, 763 F.2d 241, 244 (7th Cir. 1985). The party that bears the burden of proof on a particular issue cannot rest its case on the pleadings, but must demonstrate by specific factual allegations that there is a genuine issue of material fact that requires a trial. *Celotex*, 477 U.S. at 324. The plaintiff gets the benefit of the doubt "only if the record contains competent evidence on both sides of a factual question." *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 367 (7th Cir. 1997). If the plaintiff's evidence is "merely colorable" or "not significantly probative," then there is no genuine issue for trial and summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## A. Antitrust Claim

In its complaint, General Drilling asserted that Local 150 violated section 1 of the Sherman Act, 15 U.S.C. § 1, because it entered into

> schemes, understandings or conspiracies with one or more of General Drilling's union competitors to suppress price competition by forcing General Drilling's customers to terminate, and cease hiring, General Drilling so that one or more of the union drillers might

get the business. Material Service was coerced into effectuating the conspiracy.

Section 1 prohibits concerted anticompetitive activities, including conspiracies, designed to restrain trade unreasonably. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 810 (7th Cir. 1999). The Sherman Act "was enacted to assure customers the benefits of price competition, and . . . protect[ ] the economic freedom of participants in the relevant market." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983). Section 4 of the Clayton Act defines the class of persons who may bring a private suit to enforce the Sherman Act, providing a treble damages remedy to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws. . . ." 15 U.S.C. § 15.

The district court's grant of summary judgment in favor of Local 150 on the Sherman Act claims was based on the following findings: (1) General Drilling could not establish antitrust standing; (2) General Drilling fell short of demonstrating a *per se* unreasonable restraint of trade; (3) Local 150 was entitled to the protection of the statutory exemption to the antitrust laws; and (4) General Drilling did not sufficiently establish that Local 150 entered into a conspiracy to achieve an unlawful purpose. We review the summary judgment ruling *de novo* to determine whether a genuine issue of material fact existed. To survive a defendant's motion for summary judgment, a plaintiff must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995).

### 1. Antitrust Standing

In order to bring an antitrust claim, a plaintiff must establish that it has antitrust standing; that is, that its

claimed injuries are "of the type the antitrust laws were intended to prevent" and "reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). General Drilling's complaint alleged that Local 150 "repeatedly sought to suppress price competition by coercing General Drilling not to do business in a given area." In moving for summary judgment Local 150 argued that General Drilling did not have antitrust standing. In its brief opposing summary judgment, instead of affirmatively asserting its standing, General Drilling dismissed the standing argument with a footnote stating that the cases cited by Local 150 do not have "any applicability to the case at bar."

In most instances, a plaintiff must demonstrate consumer injury to have standing to assert antitrust violations. *Wigod v. Chi. Mercantile Exch.*, 981 F.2d 1510, 1515 (7th Cir. 1992). In this case, the quarry owner Material Service was the consumer of the drilling services provided by General Drilling and the Chicago union drillers. Material Service, however, is not bringing this suit; General Drilling is. General Drilling claims that it suffered an antitrust injury as a competitor in the drilling services industry when Local 150 and the Chicago union drillers conspired to force Material Service to terminate General Drilling. Because the parties do not dispute that Material Service terminated General Drilling, General Drilling plainly suffered a loss. Transfer of business from one company to another, however, without an accompanying effect on competition, cannot be an antitrust violation, because "the antitrust laws . . . were enacted for 'the protection of competition, not competitors.'" *Midwest Gas Servs., Inc. v. Ind. Gas Co.,* 317 F.3d 703, 711 (7th Cir. 2003) (quoting *Brunswick*, 429 U.S. at 488). To have standing as a competitor, General Drilling needed to show that "its loss comes from acts that reduce output or

raise prices to consumers." *Stamatakis Industries, Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).

General Drilling failed to present evidence indicating a negative effect on competition in the drilling services market. The consumer, Material Service, purchased the drilling services first from General Drilling and then from Finn Drill. The undisputed record evidence reveals that the price Material Service paid for those services did not change under Finn Drill—the price remained $1.75 per foot, the same as it was under General Drilling. Local 150 established as much through Olson's deposition testimony:

> Q. Did you review the bids of Raimonde or Ludwig?
>
> A. They were higher than what we were paying with General Drilling. And Finn Drill was the exact same amount. And I believe it was $1.75 per foot.

Because General Drilling did not present evidence to contest this fact, no reasonable jury could find that the claimed conspiracy resulted in raised prices to the consumer, Material Service. Moreover, no record evidence suggests that the claimed conspiracy reduced output in the market.

In *Stamatakis*, 965 F.2d 469, Chicago firms provided color separation services to advertising agencies. One of these firms, the plaintiff, alleged that its competitor conspired with others to deprive it of business in the market. This Court upheld the district court's grant of summary judgment, holding that Premier did not suffer an antitrust injury. Finding that the victims of the scheme were the advertising agencies, the Court stated that because an advertising agency "had no reason to bring higher prices upon itself, it . . . [made] sense to infer that there was never a threat to consumers." *Id.* at 472. As for Premier's decline in sales, the Court held that "a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other." *Id.* at 471.

The same reasoning applies with equal force here. As in *Stamatakis*, the plaintiff supplier (of drilling services) alleges that its competitors (the Chicago union drillers) conspired with others to deprive it of business in the market. The victims of this alleged antitrust scheme would be quarry owners like Material Service, who would logically not desire to bring higher prices upon themselves. Moreover, because the evidence reveals that prices did not rise when Finn Drill took over, there in fact "was never a threat to consumers." *Id.* at 472. In fact, the evidence presented by Local 150 reflects that Finn Drill was able to compete more efficiently in the market than General Drilling. In her deposition, Diehr testified that signing the NIMPA would have "hugely" increased General Drilling's labor costs. Finn Drill, on the other hand, was able to drill at the same quarry with the same rig and employee at the same price, $1.75 per foot, and still pay higher wages under the NIMPA. Again General Drilling offered no evidence to dispute these facts. As this Court has held, the transfer of a plaintiff's business to a competitor who can compete more efficiently in the marketplace is not an antitrust violation. *Midwest Gas*, 317 F.3d at 712.

Finally, this Court has recognized that competitors can bring an antitrust claim when they are excluded from the market and injured by defendants' actions. *Serfecz*, 67 F.3d at 598. General Drilling was not excluded from the market. General Drilling's president, Boatman, testified in his deposition that the company continues to work at the Vulcan and Northern Indiana quarries, and continues to solicit business in northwest Indiana. Moreover, Boatman testified that Material Service twice invited General Drilling back to drill at its quarries, in the spring and fall of 2003. Because General Drilling presented no record evidence to dispute these facts, no reasonable jury could find that General Drilling was excluded from the market. Summary judgment on this issue was proper.

## 2. *Per Se* Unreasonable Restraint of Trade

Because General Drilling could not establish an antitrust injury outright, it relied at argument before the district court on the presumption of injury that arises from a *per se* unreasonable restraint of trade. This Court has held that antitrust remedies may be available without a showing of market injury if an individual competitor can show that the defendant's anticompetitive actions were *per se* illegal under Section 1. *Wigod*, 981 F.2d at 1515. *Per se* violations are actions where the nature and necessary effects that result are so plainly anticompetitive that an in-depth analysis of their illegality is unnecessary. *Id.* General Drilling claims that "conspiracies to eliminate a low price competitor to suppress price competition are *per se* unreasonable restraints of trade." A Sherman Act combination "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price" in the marketplace is illegal *per se. United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). To establish a *per se* price-fixing conspiracy, a plaintiff must produce evidence "that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result. . . ." *Id.* at 224.

General Drilling predicates its price-fixing conspiracy claim on Troglio's statements to General Drilling officials at the 1996 and 2002 meetings. For instance, Keil testified that Troglio spoke at the 1996 meeting of "complaints . . . from the Union drillers." According to Diehr, "there were contract drillers up there that were not happy with General Drilling being in their area." Finally, Boatman testified that Ludwig in particular "was the one that put pressure at various times and tried to come down and get that business." Boatman could not testify to any specific conversations between Troglio and union drillers about General Drilling.

The 2002 taped conversations also provide some indication of pressure from the Chicago union drillers. On those tapes, Troglio is heard saying, "I have to get this repaired. It is an issue. An issue to the other guys and I gotta get this done." When asked who it was an issue to, Troglio replied, "Well, I'm not going to mention names but you have got a lot of competition. . . ." Although he would not specify, he intimated that the other parties were General Drilling's "signed competition." When asked in the deposition what names he had refused to mention, Troglio replied, "None." At other times on the tapes, Troglio says, "Bill, I, we were to the point that I have to do something about you" and "politically, you know, I've got to do it." General Drilling, then, presented some evidence of a conspiracy. The evidence fails, however, to show that the conspiracy was "formed for the purpose and with the effect of" price-fixing, which is necessary to establish a *per se* claim of price-fixing conspiracy. On tape, Troglio voices the concerns that he shared with the Chicago union drillers:

> KT: What I am talking about, Bill, is your competition. Be it Ludwig. Be it Raimonde. Be it Lamberts. Uh. Be it Calahan and Shue [sic]. Your competition within our jurisdiction pays a rate. That's all I care about. That you're on the same playing field as those people within our jurisdiction. . . .

Troglio and the Chicago union drillers, then, focused not on the price paid by Material Service for the services General Drilling provided, but on the amount of wages and benefits General Drilling paid to their employees. There is no evidence that Troglio ever discussed pricing with any of the Chicago union drillers or with General Drilling. As discussed below in reference to the section 303 claims, Troglio played no role in formulating Material Service's decision to terminate General Drilling or its choice of a driller to replace General Drilling. Undisputed record evidence

reveals that Material Service paid the same price to Finn Drill as it did to General Drilling for the drilling services—the price remained at $1.75 per foot. Any evidence of price-fixing was insufficient to survive summary judgment.

General Drilling's reliance on *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217 (7th Cir. 1993), to support its price-fixing claim is misplaced. In *Denny's Marina*, this Court held that the defendants' actions constituted a *per se* violation of the Sherman Act because the conspiracy was both horizontal and formed for the purpose of fixing prices. The Court found that a group of boat dealers in the central Indiana market took concerted action to protect themselves from price competition by the discounter, Denny's. When participating in industry boat shows, Denny's had a policy to "meet or beat" its competitors' prices. As a result, its competitors complained and succeeded in preventing Denny's from participating in the boat show.

In contrast, General Drilling presented no evidence to indicate that it was prevented from participating in the northwest Indiana market. Instead, General Drilling continues to solicit business and to work for Vulcan and Northern Indiana in the market. General Drilling was not even prevented from working for Material Service, who asked General Drilling to work at its quarries again twice in 2003. Because General Drilling neither presented evidence from which a reasonable jury could find that it had antitrust standing nor demonstrated a *per se* violation of the Sherman Act, defendants were entitled to judgment as a matter of law. The district court's grant of summary judgment on this issue was proper.

## B. Section 303 Claim

The National Labor Relations Board (NLRB) is vested with primary jurisdiction to determine what constitutes

an unfair labor practice. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982). "As a general rule, federal courts do not have jurisdiction over activity which 'is arguably subject to § 7 or § 8 of the [NLRA],' and they 'must defer to the exclusive competence of the National Labor Relations Board.'" *Id.* (quoting *S.D. Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959)). Federal courts may decide labor law questions that arise as collateral issues in suits brought under independent federal remedies, such as the antitrust laws. *Connell Constr. Co. v. Plumbers Local Union 100*, 421 U.S. 616, 626 (1975). As discussed above, however, there is no viable antitrust claim in this case, so the court cannot assert jurisdiction over the section 303 claims as collateral to the antitrust claim.

District courts may also entertain suits brought for violations of section 158(b)(4) of the NLRA. 29 U.S.C. § 187(b). Section 303 of the LMRA, 29 U.S.C. § 187(a), prohibits unions from engaging in any activity or conduct defined as an unfair labor practice in section 158(b)(4). Section 158(b)(4) defines an unfair labor practice, in relevant part, as an attempt by a labor organization:

> (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . .

> (B) forcing or requiring any person . . . to cease doing business with any other person. . . .

29 U.S.C. § 158(b)(4). The statute permits a union to pressure an employer with whom it has a primary labor dispute. *BE&K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council*, 156 F.3d 756, 761 (7th Cir. 1998). But a union may not advance its cause by pressuring unrelated, secondary employers to stop dealing with the primary employer. *Id.* Moreover, union pressure is unlawful under section 158(b)(4) where the union acts with "mixed motives," partially primary and partially secondary. *Mautz & Oren, Inc. v. Teamsters Union, Local 279*, 882 F.2d 1117,

1121 (7th Cir. 1989). In such a situation, "it is not necessary to find that the sole object of the strike was secondary so long as one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary." *Id.*

With a conclusory analysis, the district court granted summary judgment in favor of Local 150 on the plaintiff's Section 303 claim. Because we review this ruling *de novo*, we must determine if a genuine issue of material fact existed for the trier of fact to determine. The district court properly granted summary judgment in favor of Local 150 only if General Drilling presented no probative evidence from which a reasonable jury could find Local 150's activities violated 158(b)(4). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If there was no genuine issue of material fact as to whether the union's conduct was protected primary activity, then summary judgment was proper. *Landgrebe Motor Transp., Inc. v. District 72, Int'l Assoc. of Machinists*, 763 F.2d 241, 245 (7th Cir. 1985).

### 1. Lawful Primary Picketing

Where a union has a grievance with the terms and conditions of employment of a particular employer, the primary employer, it must focus its picketing activity on that employer. *Mautz & Oren*, 882 F.2d at 1121. The district court properly granted summary judgment in favor of Local 150 only if General Drilling presented no probative evidence from which a reasonable jury could find that Local 150's activities violated section 158(b)(4). *See Anderson*, 477 U.S. at 248. Because Local 150 was involved in a primary labor dispute with General Drilling, there was no genuine issue of material fact regarding the primary nature of Local 150's conduct against General Drilling.

All of the evidence presented to the district court supported Local 150's assertion that it picketed General

Drilling both for recognition and for area wages. Troglio succinctly stated the grounds for the dispute in his deposition testimony:

Q. So you were picketing, trying to get Mr. Boatman to sign a collective bargaining agreement?

A. And picketing for area standards.

In their testimony, General Drilling officials corroborated these two asserted motivations for picketing. Boatman, Diehr, and Keil all met with Troglio in 1996 to discuss Troglio's concerns about General Drilling. Both Boatman and Diehr confirmed that even at that early date Troglio was pressuring General Drilling for recognition on behalf of Local 150. Describing the attitude that Troglio took at the 1996 meeting, Boatman stated, "It was just, 'Join or leave.'" Diehr elaborated on her understanding of Troglio's intentions:

Q    Did he ever say he wanted you to sign a collective bargaining agreement?

A    He wanted us to either be Union or be out. That was it.

* * *

Q    What did you understand that to mean, "be Union"?

A    It meant join the Union.

Q    Sign a collective bargaining agreement?

A    That's correct.

The deposition testimony of these two General Drilling officials illustrates that as far back as 1996 Troglio was plainly interested in unionizing General Drilling.

The testimony also establishes Troglio's early concern over General Drilling's area wages. Keil testified that Troglio suggested at the same 1996 meeting that "he didn't

think we were paying the prevailing wage for that area."
Diehr named "wages and benefits" as the topic of discussion
at the meeting and specifically remembered Troglio saying
"we were not paying the wages that they paid."

Tape recordings of the two spring 2002 conversations
between Troglio and General Drilling indicate that Troglio
remained interested in both recognition and adequate
wages some six years later. Troglio again voiced his con-
cerns about area wages, saying, "Your competition within
our jurisdiction pays a rate. That's all I care about. That
you're on the same playing field as those people within our
jurisdiction." The two letters that Troglio sent out, as well
as the notice posted on the day of the picket, named area
wages as the motivation. When asked if he would be
satisfied if General Drilling "paid the union rates" but did
"not join the Union," Troglio responded that it would not
satisfy him. This does not, as General Drilling claims,
reveal as pretextual Troglio's interest in wages, but merely
affirms that his concern was not limited to wages alone.

The picket that Troglio threatened in March, and insti-
tuted in August, 2002, then, resulted from the dispute
between the two parties about Troglio's twin concerns.
Nonetheless, General Drilling maintains that those con-
cerns were illegitimate and construes as pretextual Local
150's assertion that General Drilling was not paying area
wages. Instead, General Drilling argues, Local 150 worked
to expel it from the quarries because of a preference for the
Chicago union drillers.

In his deposition testimony, Troglio admitted that the
collective bargaining agreements between the union and
quarry owners Material Service and Vulcan provided a
top wage that was less than the top wage provided in the
NIMPA. Troglio, however, argued that General Drilling
should pay the rate that contract drilling companies, not
quarry owners, paid when they did drilling work. General

Drilling presented no evidence to contradict the legitimacy of Troglio's argument. In fact, Boatman testified to the different approaches taken by the two parties:

Q The comparison you were making to him at the time, to Kevin Troglio in '96, was between a General Drilling driller and a Vulcan employee doing the drilling work, correct?

A That's right, because they were members of the laborer's union.

Q Okay. The 150 position, Kevin Troglio's position, was because you were doing it on a subcontract basis, the comparison should be between your driller employee and another subcontract driller employee, correct?

A I believe that's what he was doing, yeah.

General Drilling's president, then, acknowledged that the difference of opinion over the prevailing area wage was predicated on differing views on how to calculate that wage.

In 2002, Troglio and General Drilling again met and discussed the difference of opinion. Troglio felt that the NIMPA set the area standard, saying, "Um, if you are drilling blast holes you come under the Northern Illinois Materials Producers contract." Boatman responded by way of comparison to other quarries: ". . . we're paying comparable wage to where we're working—Francesville, Monon, Rensselaer [sic]—and comparable to what that operating engineer driller would be making." In turn, Troglio stated, "I'm not concerned with what the quarry rates is. You are not competing against the quarry people. You are competing against the other drillers." Boatman recognized the difference of opinion, saying, "not that I don't understand where you're coming from. I don't think you're necessarily right. But you understand where I'm coming from and you don't think I'm necessarily right." After

acknowledging that Troglio had legitimate labor concerns, then, General Drilling's president continued, "So, we've had a little of an impasse, I believe, but at least we know where everybody is and there's no hidden agenda." General Drilling, through its president, essentially acknowledged that Troglio's concerns were not pretextual. Although General Drilling now argues on appeal that Local 150 was acting on its preference for Chicago union drillers, no evidence supports this claim.

General Drilling also claims that Local 150 falsely asserted that it was engaged in the construction industry so that Local 150 could seek a prehire agreement. Section 158(f) allows for prehire agreements, "agreements setting the terms and conditions of employment for workers hired by the signatory employer without the union's majority status first having been established," only for construction industry employers and unions. *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 266 (1983). In the March 29th letter, Local 150 claimed that General Drilling was "performing construction work at a project within its geographic jurisdiction." Sometime after receiving the letter, General Drilling officials met with Troglio and had the following exchange:

> KT: . . .   But you're not a material worker. You are a driller. You are a contract driller.
>
> WMB:   Yes. Only for material producers.
>
> KT:   You're not dealing in materials.
>
> WMB:   I'm not in construction.

Thus, initially the two parties disputed whether General Drilling was in the construction industry. Troglio, though, later admitted in his deposition that it was not:

> Q.   Tell me what construction work it is you thought General Drilling was doing?
>
> A.   I don't know, but I'm sure—

Q. You don't know, right?

A. No.

Q. And you didn't know then, did you?

A. No.

Even if Local 150 was seeking a prehire agreement with a company that was not engaged in the construction industry, however, that conduct would be violative of section 158(b)(1)(A), not section 158(b)(4). *NLRB v. Local Union 103, Int'l Assoc. of Bridge Workers,* 434 U.S. 335, 344 (1978). As the Supreme Court has held, there "could be no clearer abridgement" of the rights enforced by section 158(b)(1)(A) than to grant "exclusive bargaining status to an agency selected by a minority of its employees." *Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 737 (1961). Because federal court jurisdiction under 29 U.S.C. § 187 extends only to violations of section 158(b)(4), a violation of section 158(b)(1)(A) would properly be heard by the NLRB. *See Local Union 103*, 434 U.S. 335 (reviewing the NLRB's initial determination under that section).

Some record evidence, described above in reference to the antitrust claim, suggests that the Chicago union drillers applied pressure on Troglio and Local 150. Nonetheless, taking those facts in the light most favorable to General Drilling, Local 150's activity was still primary. The reason behind any pressure from the union drillers comports with one of Troglio's avowed motivations for picketing—namely, his concern over area wages. According to Keil, the "complaints . . . from the Union drillers" arose because they "didn't think we were paying the prevailing wage for that area." Similarly, Diehr relayed the reason for the drillers' unhappiness: "They said that we were paying unfair—we had an unfair advantage because we were not paying the wages that they paid." General Drilling's argument focuses on the origination of the dispute (union drillers prodding Troglio into action) rather than the nature of the dispute

(one over wages and benefits). All involved witnesses stated that Troglio and Local 150 were acting on the belief that General Drilling paid inadequate wages and benefits. Under Section 29, the term "labor dispute" includes

> any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c). Because Local 150's actions fall squarely within this definition, the quarrel represents a classic case of a primary labor dispute under section 158(b)(4). *See NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 692 (1951).

Even if the Chicago union drillers notified Troglio of General Drilling's advantage and spurred his complaints about comparative wages, the undisputed fact remains that the quarrel Troglio initiated was a primary labor dispute. A plaintiff may not defeat the defendant's properly supported motion for summary judgment "without offering 'any significant probative evidence tending to support the complaint.' " *Anderson*, 477 U.S. at 256 (quoting *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 290 (1968)). General Drilling did not present evidence from which a reasonable jury could find that Local 150 engaged in conduct defined as an unfair labor practice under section 158(b)(4). Because there was no genuine issue of material fact, Local 150's activity was primary as a matter of law, and summary judgment on this issue was properly granted. *See Landgrebe*, 763 F.2d at 249.

## 2. Lawful Secondary Effects of Primary Picketing

Lawful primary picketing often has substantial and foreseeable effects on secondary employers. *Mautz & Oren*, 882 F.2d at 1121. In its amended complaint, though, General Drilling asserted that Local 150 violated section 158(b)(4) because "[b]y the threatened picketing or by the picket at Material Service's Indiana quarries, Local 150 had—as at least one objective—[sic] forcing Material Service to terminate General Drilling." When the primary employer shares a work site with a secondary employer, the picketing is presumed lawful "so long as the union does not intend to enmesh the secondary employer in the dispute." *R.L. Coolsaet Constr. Co. v. Local 150, Int'l Union of Operating Engineers*, 177 F.3d 648, 655 (7th Cir. 1999). The parties do not dispute that Troglio acted as an agent for Local 150 and that Material Service was a secondary employer. At issue here is whether Local 150 exerted unlawful secondary pressure on Material Service during its primary labor dispute with General Drilling.

Because the parties also do not dispute that the August 23rd picket occurred at the Material Service quarry while General Drilling was working there, this case falls under the common situs analysis. The NLRB and the courts have developed the *Moore Dry Dock* standards to frame the common situs analysis, *see Sailors' Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547 (1950), but the focus remains on the defendant's motive, which "is a question of fact . . . to be determined through examination of 'the totality of [the] union's conduct in [the] given situation.'" *Int'l Union of Operating Engineers, Local 150 v. NLRB*, 47 F.3d 218, 223 (7th Cir. 1995) (quoting *NLRB v. Local 307, Plumbers*, 469 F.2d 403, 408 (7th Cir. 1972)); *see also Coolsaet*, 177 F.3d at 655. At trial the burden is on the plaintiff employer to establish that any alleged secondary effects were the intended consequence of union activity. *Landgrebe*, 763 F.2d at 246. To survive summary judgment,

General Drilling needed to present some probative evidence from which a reasonable jury could find that Local 150 intended to force Material Service to terminate General Drilling and install a union driller in its place. *See Anderson*, 477 U.S. at 248. All of the evidence presented to the district court indicates that Local 150 did not act with that intent; to the contrary, the evidence reveals that Material Service made an independent decision to terminate General Drilling. Because the record evidence does not reflect a genuine issue of material fact, the grant of summary judgment on this issue was proper.

In early 2002, when Olson became aware of the possible picket, he consulted with Bernardi and decided to develop a plan to hire a union driller in case terminating General Drilling became necessary. Olson then instructed Jorns "to put a Plan B together" to get some bids for alternate drillers. Material Service admittedly developed the contingency plan in order to avoid interference with Material Service's production and sales. In his deposition testimony, Olson stated that at the time he thought it possible that Local 150 production employees would refuse to cross the picket line, and consequently that Material Service's production and sales would suffer. More specifically, he said, "We didn't want to bring labor disputes that were not, we are not involved with, inside our property, . . ." Both Jorns and McElfresh shared his understanding of the company's reason for developing the alternate plan. Thus, all the witnesses agreed on the impetus for Material Service's actions: After Local 150 notified Material Service that a picket was forthcoming, Material Service officials made a business decision that it could not sustain the loss of production and sales that would result from a picket in which its union employees refused to cross the picket line. General Drilling presented no evidence to contradict this asserted motivation.

Material Service then informed General Drilling of its intentions. According to McElfresh, he spoke with Boatman and explained to him that in the event of a picket General Drilling could no longer do the drill work "[u]ntil he got unionized or something." When Material Service finally terminated General Drilling on August 23rd, the same reason motivated the decision. Olson testified that "Boatman got terminated" because Material Service "didn't want to bring other labor issues into our, the quarry boundaries." Additionally, both Jorns and Olson believed that, if not for the picket, General Drilling would still be doing the drill work at the quarry.

Even if the union's picketing has substantial and foreseeable secondary effects, that conduct does not violate section 8(b)(4) unless the employer satisfies its burden of establishing that the union intended to cause disruption of the secondary employer's business. *Mautz & Oren*, 882 F.2d at 1121. The evidence detailed above indicates that, after learning of Local 150's intentions, Material Service made the decision to terminate General Drilling in the event of a picket. The deposition cross-examination of Olson buttresses this point:

> Q. If I understand it correctly, Mr. Olson, neither you nor anyone else at Material Services [sic] wanted to terminate General Drilling?
>
> A. I believe that's correct.
>
> Q. And it was, I think you testified, your fear about the picketing interfering with your business sales, production, et cetera that made you do what you did?
>
> A. Correct.

Although this testimony unequivocally explains Material Service's reason for terminating General Drilling, it reveals nothing about Local 150's intent. Material Service's decision

to terminate General Drilling was a consequence of Local 150's legitimate, primary labor activity. But even if the termination resulted from Local 150's activity, General Drilling cannot survive summary judgment unless some record evidence exists showing that Local 150 aimed its activity at Material Service, the neutral employer.

No evidence in the record indicates that Local 150 acted to advance Material Service's termination of General Drilling. In his deposition testimony, Troglio denied having any conversations with Material Service officials regarding the subject. The testimony of Material Service officials is consistent with his denial. Olson testified that Local 150 was not involved in developing Material Service's plan of action:

> Q. Did Local 150 have any role in Material Service's formulation of Plan B, that is the plan for the possibility of replacing General Drilling?
>
> A. Not with me.
>
> Q. So as far as you know, Material—as far as your involvement extended Material Service developed the Plan B on its own, correct?
>
> A. That's correct.

McElfresh similarly stated that he did not have any conversations with Troglio related to the potential picketing. Thus, there is no record evidence that Troglio said anything to Material Service indicating an intent on Local 150's part to pressure Material Service to terminate General Drilling. In fact, when asked directly about Troglio's intentions, Olson could not say that Troglio was intentionally aiming the picketing at Material Service:

> Q. You don't have any reason to believe that Kevin Troglio was directing the picket at Material Service, do you, Mr. Olson?

A.  I don't know what Kevin was doing, but—I don't know what Kevin was doing. I can't speak for Kevin.

Later, Olson specifically testified that Material Service was not acting under Local 150 pressure when it terminated General Drilling:

Q.  And you didn't ask General Drilling to leave because Material Service had a previous agreement with Local 150 to do so, correct?

A.  That's correct.

Q.  And you didn't ask General Drilling to leave because you had a preference for an Illinois contract driller or anybody else, right?

A.  That's correct.

The evidence of pressure on Local 150 from the Chicago union drillers, discussed above, includes no discussion of pressure applied on Material Service. While pressure from the Chicago union drillers may have contributed to Local 150's decision to picket, it offers no insight as to whether Local 150 intended to enmesh Material Service in the primary labor dispute. The only potentially probative evidence that General Drilling presented involved Troglio's meetings with Material Service officials and employees, and the two letters Local 150 sent to Material Service.

On one occasion, Troglio met with Bernardi to discuss Material Service's relationship with Local 150. Bernardi testified to the content of the exchange:

* * * I said Kevin, I'm here to deal with the contract for my employees, Material Service employees, we will deal with General Drilling later, take one issue at a time.

Q.  What did he say to you about General Drilling?

* * *

    A.  I do not remember what he said exactly.

    Q.  And when was the next time you talked to him about it?

    A.  Myself with Kevin?

    Q.  Yes.

    A.  I can't remember another time.

Bernardi later testified that they never came to an agreement concerning General Drilling because he would not discuss it. This evidence offers no insight into Local 150's intent.

Troglio's conduct at two union meetings with Material Service employees reveals that he did not intend to ensnare Material Service in the dispute. At these two meetings in early 2002, Troglio discussed the picket. The only record evidence of what he said at these meetings comes from his own deposition testimony:

    Q.  Tell me what you said at one or both of these meetings?

    A.  I was going to start organizing against General Drilling and there may well be pickets at the locations that he is drilling at.

    Q.  Anything else?

    A.  No.

General Drilling offered no evidence (the testimony of members in attendance, for instance) revealing that Troglio sought to involve Material Service in the dispute. Troglio admitted that he tried "to educate our members so they understand what we are doing and what is happening and we would hope that they would honor our picket lines, yes." But, as the Supreme Court has held, "picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against

their employer in order to force him to refuse to deal with the struck employer." *Local 761, Int'l Union of Electrical Workers v. NLRB*, 366 U.S. 667, 673-74 (1961).

The only remaining evidence proferred by General Drilling, then, consists of the two letters sent by Troglio to Material Service. Local 150 says it sent Material Service a copy of the March 29th letter to apprise it of the possibility of a picket. This letter contained no improper language. In fact, in it Local 150 specifically denied any intent to influence the secondary employer: "There is no desire on behalf of Operating Engineers Local 150 to have any contractual relationship in effect between your company, any other person, corporation or proprietorship interfered with in any manner." When Troglio faxed it over to Material Service, however, he added the following words: "Please review and any support would be appreciated." The second, August 15th letter contained similar language: "We are appealing to contractors, customers and other employers in hope that they will cease using the services of this company." General Drilling claims that with these two communications Local 150 improperly aimed the picket at Material Service.

Both of those communications, however, were aspirational in tone, expressing Local 150's hope to have Material Service's support in its efforts instead of its intent to enmesh the secondary employer in the dispute. Primary picketing always has as one of its goals the inducement of secondary employers to stop dealing with the primary employer, and the object of inducing this disruption is protected. *Landgrebe*, 763 F.2d at 246. By their terms, the letters expressly indicated that the picket was not aimed at Material Service and accurately explained the nature of the primary labor dispute: "Please be advised that Local 150 has no present dispute with your company. Rather, Local 150's dispute is with General Drilling."

The letters also conceded that common situs picketing was a possibility: "Any strike against General Drilling may include lawful picketing of General Drilling's opera-

tions at your facility. Once General Drilling is no longer present at your jobsite or facility, Local 150 will cease its picketing at your jobsite or facility. Such picketing is lawful primary picketing." General Drilling argues that this language makes Local 150's conduct unlawful secondary activity under *Coolsaet*, 177 F.3d 648. While the union in that case employed similar language in statements to the secondary employer, the court also found that the union used the secondary employer's workers on the picket line and failed to limit the picket to the times and places the primary employer worked. Thus, a presumption of secondary intent arose which Local 150 had to rebut.

In this case, because the parties do not dispute that Local 150 conducted the common situs picketing properly, Local 150 did not have to rebut the presumption of secondary intent. When a union complies with the *Moore Dry Dock* standards for common situs picketing, the picketing is presumed to be lawful primary activity. *See Int'l Union of Operating Engineers, Local 150 v. NLRB*, 47 F.3d 218, 222 (7th Cir. 1995). The disruption of business relations between the primary and secondary employer, then, was merely "the necessary consequence of the purest form of primary activity." *Landgrebe*, 763 F.2d at 246 (quoting *NLRB v. Local 825, Int'l Union of Operating Engineers*, 400 U.S. 297, 304 (1971)). All of the evidence comports with Olson's testimony that the decision to terminate General Drilling arose from the group consultation of Material Service officials.

Similarly, no record evidence exists showing that Local 150 pressured Material Service to hire a union replacement for General Drilling. In his initial Plan B, Jorns identified two union drillers, Ludwig and Raimonde, as possible replacements for General Drilling. He allegedly included those two drillers because both he and Material Service had had good past experiences with them. Olson specifically denied that Troglio or Local 150 expressed an opinion on

which company Material Service should choose as the replacement:

> Q. Mr. Olson, did Kevin Troglio or anyone from Local 150 ever express to you or to anybody else from Material Service a preference over which contract driller got the work at the Indiana quarry after General Drilling left?

> \* \* \*

> A. I have never spoken to Kevin on this subject and I haven't the faintest idea what his conversations were with anybody else in the company.

Jorns also denied that Local 150 was involved in the selection of a replacement:

> Q. You didn't go to Raimonde and Ludwig because Kevin Troglio or anybody else from Local 150 told you they prefer one contractor over another, did you?

> A. No.

The only evidence that General Drilling presented to show Local 150's intent to influence the process to find a replacement consisted of a list of union drillers that Troglio sent to Material Service. That list, sent as an attachment to the letter of August 15th, included the name of the union driller Ludwig, the company chosen by Jorns as the Plan B replacement. General Drilling's Boatman stated in his deposition that he believed Ludwig was the union driller that had been exerting pressure on Troglio to get the business at the quarry. The list sent by Troglio, however, could not possibly have influenced Material Service's decision to choose a replacement because Jorns had already slotted Ludwig as the replacement driller on June 27, 2002. In addition, Olson unequivocally testified that there was no conspiracy to replace General Drilling with Ludwig:

Q.  Material Service didn't ask General Drilling to leave, to leave because it was trying to get Ludwig into that facility to your knowledge, Mr. Olson?

A.  We did not ask General Drilling to leave to get Ludwig into our facility.

General Drilling offered no facts to controvert this version of events. Moreover, Troglio testified to his reason for sending the list to Material Service: "During discussions with the superintendents if they requested who else they could use, then I attached a copy of the signatory drillers." General Drilling introduced no evidence (such as testimony of Material Service officials stating that they did not request the list) controverting this motivation. As a result, no reasonable jury could determine that Local 150's actions evidenced an intent to orchestrate the replacement of General Drilling with Ludwig.

Ultimately, Finn Drill, instead of Ludwig, replaced General Drilling as the contract driller at the quarry. But all the deposition witnesses—Olson, McElfresh, and Boatman—agreed that consideration of Finn Drill as the replacement began well after Jorns developed Plan B and at the suggestion of General Drilling's Boatman. When McElfresh suggested the possibility of leasing the existing equipment to a new driller so that the work could continue uninterrupted, Boatman said, "you will be contacted." The next day, Finn Drill's Garvin contacted McElfresh and scheduled an appointment to view the facility. Garvin toured the quarry on August 14th, 2002, and later that week came in with the lowest bid, identical to the rate that General Drilling had charged for the work. Boatman had worked out a deal with Finn Drill whereby the same equipment and personnel could operate at the quarry under the new company's name. McElfresh testified that Finn Drill had provided Material Service "outstanding service from 1993" in other capacities. Olson

testified that Material Service chose Finn Drill because they knew Garvin, the owner, to be "very capable," he had a "vast amount of experience," and they "had a great deal of confidence in him."

According to Material Service officials, then, they chose Finn Drill because they knew based on past performance that Finn Drill and its owner Garvin were capable, and because Finn Drill came in with the lowest bid of the three union drillers. Boatman, the president of General Drilling, suggested Finn Drill because he didn't want the work to go to Ludwig. Instead of acting under pressure from Local 150 in finding a replacement, then, Material Service considered and eventually selected General Drilling's suggested replacement.

Although Troglio included Finn Drill with Ludwig on the list he sent to Material Service on August 15th, by that date Finn Drill had already toured the quarry and was preparing to submit a bid. Material Service decided to replace General Drilling with Finn Drill independently of Local 150's influence. Moreover, as discussed above, Troglio explained that he sent the list of union drillers to superintendents who requested it. Again, because General Drilling introduced no evidence to controvert this explanation, no reasonable jury could find that Material Service chose Finn Drill because of pressure by Local 150.

Thus, taking all the evidence in the light most favorable to General Drilling, no reasonable jury could find that Local 150 intended to involve Material Service in its primary labor dispute with General Drilling. This Court has recognized an analytical distinction "between intending to enmesh secondary employers in a dispute not their own, and acting with knowledge that secondary employers will inevitably be affected by the union's actions." *Mautz & Oren*, 882 F.2d at 1121. Here, Local 150 acted knowing that Material Service would be affected by its primary activities,

but did not act with the intent to enmesh Material Service in the primary dispute.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Local 150.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*